# In The United States Bankruptcy Court
## For The Western District of Texas
### San Antonio Division

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Gabriel Investment Group, Inc., et al., | § | Bankruptcy No. 19-52298-RBK |
| | § | |
| Debtors | § | Jointly Administered |

---

### Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts

---

To the Honorable Judge Ronald B. King, United States Bankruptcy Judge:

Gabriel Investment Group Inc. et al. ("**Debtors**" or "**Gabriel's**"),[1] Debtors in the above captioned cases (the "**Cases**"), by and through their counsel Pulman, Cappuccio & Pullen, LLP, hereby files this *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedure Motion**").  In support of the Sale Procedure Motion, Debtors respectfully represent as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The terms "Debtors" and "Gabriel's" as used herein shall mean Gabriel Investment Group, Inc. ("GIG"), Gabriel GP, Inc. ("GP"), Gabriel Holdings, LLC ("Gabriel Holdings"), Don's & Ben's, Inc. ("D&B"), and S.A. Discount Liquor, Inc. ("Discount Liquor") collectively.

2.      On September 27, 2019 (the "**Petition Date**"), Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

3.      Debtors continue to manage and operate their businesses pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  The Official Committee of Unsecure Creditors (the "**Committee**") was appointed on November 21, 2019.  No trustee or examiner has been requested or appointed.

4.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

5.      Attached as Exhibit A is the proposed order on the Motion.

## II.      <u>FACTUAL BACKGROUND</u>

6.      Gabriel's has been a San Antonio institution since 1948.  The Gabriel family has managed a chain of South Texas package stores that over the course of two or three generations grew to become a well-known community mainstay, one that today employs approximately 250 individuals across the region. Throughout its history Gabriel's has supplied the citizens of San Antonio with fine wines, high-quality liquors, and exceptional beers at reasonable prices.  It has also been a bastion of the San Antonio community through its involvement in various events all over the city, including Fiesta, as well as its involvement with various non-profits raising money to support the region's less fortunate.  Today, Gabriel's operates 15 package-store locations as Gabriel's Liquor and 30 package-store locations as Don's & Ben's Liquor.

7.      While competition is a challenge for any business, beginning in 2013 Gabriel's began facing increased competition from the influx of big-box retailers. These changes in the

San Antonio market gradually caused several of Gabriel's locations to become unprofitable. Additionally, Gabriel's wholesale business started to suffer losses due to the increased competition. The Gabriel family did its best to manage the operations to address this economic turmoil; however, the losses continued to mount.

8. In 2019, the Gabriel family considered merging Gabriel's with a Texas retailer that had the financial resources to weather the tougher competition in San Antonio. Unfortunately, even though the discussions proceeded to the point of setting a closing date, the merger ultimately fell through. During that same time, Gabriel's failed to timely pay its vendors, which led to Gabriel's being placed on the Texas Alcoholic Beverage Commission ("**TABC**") Delinquent List. Pursuant to TABC regulations, placement on the TABC Delinquent List prohibits all liquor wholesalers from selling to Gabriel's.

9. Gabriel's line of credit with its lender PNC Bank, National Association expired on September 30, 2019.

10. Since the Petition Date, Debtors have undertaken efforts to maximize the value of the assets of the bankruptcy estates (collectively, the "**Estates**") by reducing the cost of operations and liquidating assets as certain locations. Debtors have also retained National Transaction Advisors, Inc., a Riverbend Company ("**Riverbend**"), as investment banker to assist in obtaining proposals for (a) the refinancing of the Debtors' debt obligations or (b) the sale of the Debtors' ongoing business operations.

11. Through Riverbend's efforts, the Debtors have received a Letter of Intent from Nooner Holding, Ltd. ("**NH**" or the "**Stalking Horse Bidder**") offering a purchase price of $7 million (the "**Purchase Price**"), subject to certain conditions, for the purchase of all assets, rights, entitlement, and privileges of the Debtors, including possibly (a) 32 locations and (b)(i)

the assumption and assignment to NH of all leasehold rights in all locations or used in the Debtors' business operations, (ii) the assumption and assignment of all personal-property leases used in the Debtors' business operations and designated by NH in its sole and absolute discretion, (iii) the conveyance free and clear of all liens, claims, encumbrances, and interests of all inventory, furniture, fixture, equipment located at or used in the operation for each of the 32 locations, and (iv) conveyance of all intellectual property related to the operation of the Debtors' businesses, including, without limitation, all patents, permits, licenses, exemptions (including any pre-1949 or pre-1995 permits), trademarks, designs, social-media assets, e-commerce assets, URLs, customer lists, and data associated with the stores to NH free and clear of all liens, claims, encumbrances, and interests (collectively, items (i)-(iv) are the "**Property**") and (c) the acquisition of all stock in the Debtors.  The Purchase Price contemplates, among other things, a sale of inventory, which the Debtors currently value at $5 million; however, the inventory price is subject to certain additions or reductions based on the actual cost of inventory on hand at the time of Closing.  The Debtors propose to effectuate the transactions with NH (the "**Proposed Transactions**") through a Chapter 11 Plan (the "**Plan**") and related Sale and Purchase Agreement, a draft of which is attached as Exhibit B (the "**Asset Purchase Agreement**"), subject to higher or better offers.

### III.  <u>REQUESTED RELIEF</u>

12.    By this Sale Procedure Motion, Debtors request approval (a) NH as the Stalking Horse Bidder (defined below), (b) the Stalking Horse Bid (defined below) and (c) the procedures to govern the bidding, auction and sale process for the Proposed Transactions. Debtors believe that the procedures proposed herein will maximize the value of the Property.

13. For this purpose, Debtors request that the Court enter an order approving (a) the form and manner of notice of the Sale Procedures substantially in the form attached as Exhibit C (the "**Sale Notice**"); (b) the bidding, auction and sale procedures, substantially in the form attached as Exhibit D (the "**Sale Procedures**"); (c) the form and manner of notice of the Cure Claim Procedures substantially in the form attached as Exhibit E (the "**Cure Claim Notice**"); (d) the bidding protections afforded to any stalking-horse bidder that meets the requirements set forth in this Motion, including the proposed break-up fee and payment thereof; and (e) set a date and time to conduct the auction at the Sale Hearing.

A. **Sale Notice**

14. Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least 21 days' notice by mail of a proposed use, sale or lease of property of the estate other than in the ordinary course of business. Further, Bankruptcy Rule 2002(c) sets forth that such notices must include the time and place of any sale, the terms and conditions of such sale, and the time fixed for filing objections.

15. The Sale Notice (a) contains the type of information required under Bankruptcy Rule 2002, (b) includes information concerning the Sale Procedures, and (c) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (i) the auction of the Property, (ii) the sale Procedures, (iii) the deadline to object to the Sale, and (iv) the Sale Hearing. Accordingly, Debtors request that this Court approve the form and content of the Sale Notice.

16. Within three business days after the Court enters an Order approving this Motion, Debtors shall serve the Sale Notice by (a) first-class United States mail, postage-prepaid on (i) the parties identified on the Creditor Matrix in these Cases at the addresses set forth therein, (ii) the parties that have filed proofs of claim in these Cases at the addresses set forth in the

respective proofs of claim, and (iii) any other parties who have expressed an interest in acquiring the Property; and (b) the Court's electronic-filing system on those parties receiving electronic notice by such system.  Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the auction, the proposed Sale, and the procedure for objecting thereto. Additionally, Debtors may provide publication notice if (a)requested by NH or (b) the Debtors believe that such additional notice would improve the results of the auction and is in the best interests of the Estates.

**B.**    **Sale Procedures**

17.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private or public sale.  Debtors believe that good cause exists to expose the Property to a public sale.  A public sale conducted substantially in accordance with the Sale Procedures will enable the Debtors to obtain the highest or best offer for the Property, thereby maximizing its value for the benefit of the Estates.  The Sale Procedures provide for an expeditious manner to obtain the highest or best offers for the Property. The Sales Procedures provide for establishing NH as a "stalking-horse bidder" and for receipt of "qualified bids" by "qualified bidders."   Therefore, Debtors respectfully request that this Court approve the Sale Procedures.

18.    Any party wishing to participate as a qualified bidder should provide an executed Asset Purchase Agreement substantially in the same form as Exhibit B to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 Dollars ($100,000.00) (the "**Earnest Money Deposit**") with the designated escrow agent by no later than **April 15, 2020** (the "**Bid Deadline**"). Any such Bid submitted by the Bid Deadline shall be in the amount of at least Seven Million Five Hundred Thousand and no/100

Dollars ($7,500,000.00) to be a Qualified Bid and to allow the Bidder to participate in the auction of the Property ("**Qualified Bidder**").  The deposited funds will be held by the escrow agent until after the closing of the sale. The Earnest Money Deposit of all Qualified Bidders (except for the Successful Bidder) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in no event later than seven (7) business days after the closing of the Sale.

19.     The definition of Property in the NH proposal includes acquisition of the equity interests in Gabriel Investment Group, Inc., a publicly held corporation (the "**PubCo**") that is authorized to own liquor-store permits under Section 22.16(f) of the Texas Alcoholic Beverage Code.  Debtors will also consider offers seeking to purchase either the PubCo separately or purchase the liquor store assets without acquiring the equity interests in PubCo.

20.     On April 16, 2020, Debtors will file a Notice of Auction to inform creditors, parties-in-interest and the Court whether there are any other Qualified Bidders, such that the auction will be conducted on April 20, 2020.

21.     In addition, Debtors request that the Court set an overbid procedure, so that Debtors can maximize the sale price of the Property. Debtors propose an overbid procedure requiring that any competing bid with respect to the Property must submit an overbid of at least $100,000.00 above the previous highest or best offer.

22.     In the event Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, the Debtors shall conduct an auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on **Monday April 20, 2020 at 1:30 p.m.**, prevailing Central Time and all Qualified Bidders may participate in such Auction.

23.     Following conclusion of the Auction, Debtors shall request that the Court approve the highest and best standing Bid received at the Auction as the winning bid (the "Successful Bid") at a hearing to be held at Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on **Thursday April 23, 2020 at 1:30 p.m.**, prevailing Central Time (the "**Sale Hearing**").

24.     The closing of the sale of the Property shall occur no later than April 30, 2020; provided, however, that this requirement may be waived by agreement between Debtors, PNC, the Committee, and the Successful Bidder.

25.     If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), as determined by the Debtors, PNC, and the Committee (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Property and Debtors will be authorized to consummate the Sale of the Property to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Debtors until a Qualified Bidder shall consummate the Sale.

26.     If any Successful Bidder fails to consummate the purchase of the Property, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estates.

27.     Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance with the Sale Procedures Order)  (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before on or before **April 17, 2020** (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

28.     Debtors, with the written consent of PNC and the Committee,  reserve the right to (a) determine whether any Qualified Bid is a Successful Bid and (b) reject, at any time prior to the entry of the Sale Order by the Bankruptcy Court, without liability, any Bid that Debtors, with the written consent of PNC and the Committee, determine to be (i) inadequate or insufficient, (ii) not in conformity with the Sale Procedures or the Bankruptcy Code, or (iii) contrary to the best interests of the Estates.

29.     Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

## C.     <u>Stalking Horse Bid</u>

30.     Debtors request that the Court declare that NH is a stalking-horse bidder (the "**Stalking Horse Bidder**") and its bid as the "stalking horse bid" (the "**Stalking Horse Bid**") entitled to stalking-horse bid protections, including: (a) a $300,000 "break-up fee" ("**Break Up Fee**"); (b) a $75,000 "expense reimbursement" (the "**Expense Reimbursement**"); (c) an initial

overbid (the "**Initial Overbid**") equal to the sum of (w) the Purchase Price, (x) the Break Up Fee, (y) Expense Reimbursement, and (z) $125,000; and (d) subsequent overbids ("**Subsequent Overbids**") equal to $100,000. The Break Up Fee and the Expense Reimbursement shall both be entitled to administrative-expense priority (§§ 503(b)(1)(A) and 507(a)), senior to all administrative expenses (other than super-priority administrative claims of PNC for failed adequate protection) and payable to NH if the Proposed Transactions are not consummated with NH; provided, however, that (i) the Stalking Horse Bidder shall not be entitled to payment of the Breakup Fee or Expense Reimbursement if the Stalking Horse Bidder's Asset Purchase Agreement is terminated by the Debtors as a result of a breach by the Stalking Horse Bidder and (ii) the Break Up Fee and Expense Reimbursement may only be paid to the Stalking Horse Bidder with proceeds received following the closing of an alternate sale transaction. If there is a credit bid (the "**Credit Bid**") for the Property, then the Credit Bid shall have a cash component equal to the sum of the Break Up Fee and the Expense Reimbursement. NH shall be allowed to credit bid the Break Up Fee and Expense Reimbursement in any subsequent bids. The Break-Up Fee would be an actual and necessary cost of preserving the Estates and would, in Debtors' view, be commensurate to the real and substantial benefit conferred on the Estates by the Stalking Horse Bidder. Such Break-Up Fee is also reasonable and appropriate in light of, among other things (a) a Break Up Fee is regularly approved by Courts in the Western District of Texas; (b) the Break Up Fee will only be paid if Debtors receive an overbid of at least Seven Million Five Hundred Thousand and no/100 Dollars ($7,500,000.00), which would still provide additional funds to the Estates after paying the Break-Up Fee; and (c) the likely benefits the Stalking Horse Bid will provide to the Estates, their creditors, and other parties in interest.

31.     The payment of a break-up fee is normal and customary in transactions of this nature. Break-up fees are a vital means by which an estate can manage value maximization risk by setting a value floor for assets to be conveyed, which is a key benefit to the Estates and weighs heavily in favor of approving the Break Up Fee. A break-up fee is an important tool to be used to encourage bidding. Court approval of the Break Up Fee to NH, is necessary, reasonable, and in the best interests of the Debtors, their Estates and creditors. Historically, bankruptcy courts have approved bidding incentives similar to the stalking-horse bid solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a debtor taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Texas Rangers Baseball Partners*, 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010)(breakup fee was appropriate for undertaking a sale transaction).

32.     The Break Up Fee is undoubtedly consistent with the "business judgment rule." The Stalking Horse Bidder likely would not have agreed to its proposed bid without this bargained-for protection. The proposed stalking-horse bid protections are reasonable and consistent with the range of bidding protection typically approved by bankruptcy courts in this District. See, e.g., *In re IO at Tech Ridge LP*, Case No. 17-11540-tmd.

### D.     <u>Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases</u>

33.     To facilitate the Proposed Transactions, the Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts if the Debtors decide to assume and assign such contracts or leases:

i.   **Notice of Assumption and Assignment:**  On March 18, 2020, Debtors shall file with the Court and serve via first-class mail on all counterparties to any of the Debtors' executory contracts and unexpired leases (together, the **"365 Contracts")** and all parties who have requested notice in these Cases pursuant to Bankruptcy Rule 2002 (collectively, the **"Contract Notice Parties")** a notice of proposed assumption, assignment and sale.

ii.  The Notice of Assumption and Assignment shall include the Debtors' proposed calculation of the amount necessary to cure all monetary defaults (the "**Cure Costs**") for each 365 Contract. The Debtors reserve the right to supplement the list of 365 Contracts and provide additional Notices of Assumption and Assignment for previously omitted 365 Contracts as appropriate, and to remove a 365 Contract from the list at any time prior to the conclusion of the Sale Hearing.

iii. Although the Debtors have made a good-faith effort to identify all 365 Contracts that may be assumed and assigned with the Proposed Transactions, they may discover additional 365 Contracts that a bidder may want the Debtors to assume and assign in a proposed transaction. Accordingly, if at any time after the entry of the Sale Order, the Debtors identify additional prepetition executory contracts that may be subject to being assumed and assigned to the Successful Bidder, the Debtors shall serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment Notice**") by facsimile, electronic transmission, hand delivery or overnight mail on the counterparty (and its attorney, if known) to each supplemental 365 Contract at the last-known address available to the Debtors by no later than ten (10) days before the proposed effective date of the assumption and assignment. Each Supplemental Notice of Assumption and Assignment shall set forth (a) the name and address of the 365 Contract counterparty, (b) notice of the proposed effective date of the assignment (subject to the right of Successful Bidder(s) to withdraw such request for assumption and assignment of the 365 Contract prior to the Closing), (c) identification of the 365 Contract, (d) the Cure Costs, if any, to the extent such 365 Contract has been designated for assumption and assignment by a Successful Bidder, and (e) the proposed adequate assurance, as applicable.

iv.  Each Supplemental Notice of Assumption and Assignment that identifies a 365 Contract that was not previously identified as one that may be assumed, assigned, and sold or that reduces the calculation of the Cure Costs (if the obligation to provide such information has occurred) shall provide a deadline of not less than seven (7) days from the date of service of such Notice of Assumption and Assignment by which the counterparty to any such added 365 Contract may object to (a) its listing as a 365 Contract and (b) the calculation of the Cure Costs for such 365 Contract. The inclusion of a 365 Contract on the Notice of Assumption and Assignment shall not obligate any bidder to take assignment of such 365 Contract.  Only those 365 Contracts that are accepted by a bidder, I that bidder's sole and absolute discretion will be assumed, assigned and sold to the bidder.

v.    Within one (1) business day after the conclusion of the Auction, the Debtors will file the Successful Bidder's proposed form of adequate assurance of future performance with the Bankruptcy Court.  Objections to the successful bidder's adequate assurance of future performance must be raised no later than April 22, 2020.

vi.   **Objections to Assumption and Assignment**: Any counterparty to a 365 Contract shall file any objections to (a) the proposed assumption, assignment and sale of the 365 Contracts (and must state in its objection, with specificity, the legal and factual basis thereof) and (b) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than twenty-one (21) days from the date of the Notice of Assumption and Assignment (the "**Assumption and Assignment Objection Deadline**").

vii.  If a counterparty to a 365 Contract files a timely objection asserting a higher cure than the maximum Cure Costs set forth in the Notice of Assignment and Assumption, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under the 365 Contracts, if it is ultimately designated a 365 Contract by a Qualified Bidder to be assumed, assigned, and sold to it in connection with the Proposed Transaction (a "**Desired 365 Contract**"), will also be heard at the Sale Hearing.

viii. If no objection is timely filed and served, the counterparty to a 365 Contract shall be deemed to have consented to the assumption, assignment, and sale of the 365 Contract to any Successful Bidder if such 365 Contract is designated by any Successful Bidder as a Desired 365 Contract and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale, except with respect to the adequate assurance of future performance by any Successful Bidder. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at Sale Hearing. The Cure Costs provided to the contract counterparty shall be controlling, notwithstanding anything to the contrary in any 365 Contract, applicable law, or any other document, and the counterparty to the 365 Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors or any bidder, or the property of any of them.

## E.    <u>Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate</u>

34.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h). The

purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

35.     To preserve the value of the Estates and limit the costs of administering and preserving the Property, it is critical that the Debtors close the sale of the Property as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## IV.     **PRAYER**

WHEREFORE, Debtors respectfully request that the Court enter an Order approving (a) the bidding, auction and sale procedures; (b) the form and manner of the Sale Notice; (c) the procedures associated with the assumption and assignment of executory contracts and unexpired leases; (d) the form and manner of notice of the Cure Claim Procedures; (e) the bidding protections afforded to the Stalking Horse Bidder; (f) a date and time to conduct the auction at the Sale Hearing; and (g) such other relief, both at law and in equity to which Debtors may be justly entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:  */s/ Thomas Rice*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Thomas Rice
    Texas State Bar No. 24025613
    trice@pulmanlaw.com
    Amber F. Fly
    Texas State Bar No. 24101761
    afly@pulmanlaw.com

**ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be filed on March 10, 2020, using the Court's CM/ECF System which caused it to be served upon those parties registered in the system as indicated below.

*Via CM/ECF:*
*USTPRegion07.SN.ECF@usdoj.gov*
United States Trustee
615 E. Houston, Room 533
San Antonio, TX  78205

*Via CM/ECF: brian.smith@hklaw.com,*
*brent.mcilwain@hklaw.com;*
*robert.jones@hklaw.com;*
Brent R. McIlwain/Brian J. Smith
Holland & Knight
200 Crescent Court, Suite 1600
Dallas, TX 75201

*Via CM/ECF: srose@jw.com*
J. Scott Rose
Jackson Walker, LLP
112 E. Pecan St., Suite 2400
San Antonio, TX  78205

*Via CM/ECF: david.wender@alston.com*
David A. Wender
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

*Via CM/ECF: pautry@branscomblaw.com*
Patrick H. Autry
Branscomb Law
8023 Vantage, # 560
San Antonio, TX 78230

*Via CM/ECF: don.stecker@lgbs.com*
Don Stecker
Linebarger Goggan et al
711 Navarro, Suite 300
San Antonio, TX  78205

*Via CM/ECF: csmall@dslawpc.com,*
*drios@dslawpc.com*
Caroline Newman Small /Sarah Santos
Davis & Santos, P.C.
719 S. Flores Street
San Antonio, Texas 78204

*Via CM/ECF: mshriro@singerlevick.com*
Michelle Shriro
Singer & Levick
16200 Addison Rd. #140
Addison, TX  75001

*Via CM/ECF:*
*dgragg@langleybanack.com,*
*cjohnston@langleybanack.com*
*sfoushee@langleybanack.com*
David S. Gragg
Langley & Banack Incorporated
745 E. Mulberry #700
San Antonio, Texas 78212-3166

*Via CM/ECF:*
*ahochheiser@mauricewutscher.com*
Alan Craig Hochheiser
Maurice Wutscher, LLP
23611 Chagrin Blvd., Suite 207
Beachwood, OH 44122

*Via CM/ECF: treywhite@villawhite.com,*
*ecfnotices@villawhite.com;*
*bankruptcysa@gmail.com*
Morris E. "Trey" White
Villa & White, LLP
1100 NW Loop 410 #802
San Antonio, Texas 78213

***Via CM/ECF: ron@smeberg.com***
Ronald J. Smeberg
The Smeberg Law Firm, PLLC
2010 West Kings Highway
San Antonio, Texas 78201-4926

***Via CM/ECF: tmckenzie@tsslawyers.com***
Thomas W. McKenzie
Law Office of Thomas W. McKenzie
10107 McAllister Frwy
San Antonio, TX  78216

***Via CM/ECF:***
***jason.binford@oag.texas.gov;***
***todd.headden@oag.texas.gov;***
***matthew.bohuslav@oag.texas.gov***
Jason B. Binford
Todd B. Headden
Matthew Bohuslav
Office of Texas A.G.
Bankruptcy & Collections Division
P. O. Box 12548 MC008
Austin, Texas 78711-2548

*/s/Thomas Rice*
Thomas Rice

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., | § | BANKRUPTCY NO. 19-52298-RBK |
| | § | |
| DEBTORS | § | CHAPTER 11 CASE |

---

**ORDER APPROVING (A) SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS; (B) THE FORM OF NOTICE FOR THE SALE OF THE DEBTORS' ASSETS AND (C) THE FORM OF NOTICE RELATED TO THE ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS**

---

Came on for consideration, the *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedure Motion**")[1]  Based on the representations made in the Sale Procedure Motion, the Court finds that (i) it has jurisdiction over

---

[1] Capitalized terms unless otherwise defined herein shall have the meaning as ascribed to them in the Sale Procedure Motion.

{00469972 2}

the matters raised in the Sale Procedure Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court my enter a final order on the Sale Procedure Motion; (iii) the relief requested in the Sale Procedure Motion seeking the establishment of sale procedures and bid protections in connection with the sale of certain of the Debtors' assets is in the best interests of the Debtors, their Estates, and their creditors; (iv) proper and adequate notice of the Sale Procedure Motion has been given and no further notice is necessary; (v) all objections to the Sale Procedure Motion that were filed have been resolved or are hereby overruled; and (vi) based on the record herein, after due deliberation, good and sufficient cause exists for the granting of the Sale Procedure Motion in all respects, and pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014, the Court make the additional **FINDINGS OF FACT AND CONCLUSIONS OF LAW.**

**THE COURT FINDS THAT:**

A.      This Court has jurisdiction to consider the Sale Procedure Motion and grant the relief requested pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order on the Sale Procedure Motion. Venue of these Cases is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Sale Procedure Motion and related hearing or matter was reasonable and sufficient and complied with all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules in light of the circumstances and nature of the relief requested therein, and no other or further notice is necessary.  A reasonable and fair opportunity to object to the Sale Procedure Motion and all relief requested therein and granted in this Order has been afforded.

C. The legal and factual bases set forth in the Sale Procedure Motion establish just cause for the relief granted herein. Granting the relief is in the best interests of the Debtors, their Estates, and creditors.

D. Debtors have articulated good and sufficient reasons for this Court to grant the Sale Procedure Motion and to approve the Sale Notice, in substantially the same form as Exhibit 1 to this Order, the Sale Procedures, in substantially the same form as Exhibit 2 to this Order, and the Cure Claim Notice, in substantially the same form as Exhibit 3 to this Order.

E. The Sale Procedures are reasonable and appropriate and designed to maximize the value of the Debtors' assets.

F. The bid protections being granted to Nooner Holdings, Ltd. (the "**Stalking Horse Bidder**") were negotiated in good faith, at arms' length, and necessary inducements to the Stalking Horse Bidder and are (1) actual and necessary costs of preserving the Estates within the meaning of Bankruptcy Code section 503(b)(1)(A) and 507(a), (2) commensurate to the real and substantial benefit conferred on the Estates by such Stalking Horse Bidder, (3) reasonable and appropriate in light of the circumstances.

G. The payment of the Break Up Fee and Expense Reimbursement due and payable immediately to the Stalking Horse Bidder if the Proposed Transactions are not consummated with the Stalking Horse Bidder, as well as the establishment of the proposed sale procedures, are both reasonable and necessary to enter into a sale transaction and to obtain the highest price possible for the Property.

**THEREFORE, IT IS ORDERED THAT:**

1. The Sale Procedure Motion is approved and granted.

2.    Any objections to the Sale Procedure Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Sale Procedure Motion, are overruled in their entirety.

3.    The Sale Notice, attached as Exhibit 1 to this Order, is approved. Within three business days after the Court enters an Order approving this Sale Procedure Motion, Debtors shall serve the Sale Notice by (a) first-class United States mail, postage-prepaid on (i) the parties identified on the Creditor Matrix in these Cases at the addresses set forth therein, (ii) the parties that have filed proofs of claim in these Cases at the addresses set forth in the respective proofs of claim, and (iii) any other parties who have expressed an interest in acquiring the Property; and (b) the Court's electronic-filing system on those parties receiving electronic notice by such system. Service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the auction, the proposed Sale, and the procedure for objecting thereto. Additionally, Debtors may provide publication notice if (a) requested by NH or (b) the Debtors believe that such additional notice would improve the results of the auction and is in the best interests of the Estates.

4.    NH is hereby approved as the Staking Horse Bidder. The proposed bid protections are hereby approved, in the manner set forth herein, including: (a) a Break Up Fee of $300,000; (b) an Expense Reimbursement of $75,000; (c) an Initial Overbid equal to the sum of (w) the Purchase Price, (x) the Break Up Fee, (y) Expense Reimbursement, and (z) $125,000; and (d) Subsequent Overbids equal to $100,000. The Break Up Fee and the Expense Reimbursement are entitled to administrative-expense priority pursuant to sections 503(b)(1)(A) and 507(a) of the Bankruptcy Code, but senior to all other administrative expenses (other than super-priority administrative claims of PNC for failed adequate protection), and payable to the Stalking Horse Bidder if the

Proposed Transactions are not consummated with the Stalking Horse Bidder; provided, however, that (i) the Stalking Horse Bidder shall not be entitled to payment of the Breakup Fee or Expense Reimbursement if the Stalking Horse Bidder's asset purchase agreement is terminated by the Debtors as a result of a breach by the Stalking Horse Bidder and (ii) the Break Up Fee and Expense Reimbursement shall be subordinate only to PNC's outstanding secured and super-priority administrative claims for failed adequate protection; the Break Up Fee and Expense Reimbursement shall be senior to all other administrative expenses. If there is a Credit Bid for the Property, then the Credit Bid shall have a cash component equal to the sum of the Break Up Fee and the Expense Reimbursement. The Stalking Horse Bidder shall be allowed to credit bid the Break Up Fee and Expense Reimbursement in any subsequent bids.

5.    The Sale Procedures, attached as Exhibit 2 to this Order, which relate to the sale of the Property (the "**Sale**"), are approved.

6.    Any party, other than the Stalking Horse Bidder, wishing to participate as a qualified bidder should provide an Asset Purchase Agreement to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 Dollars ($100,000.00) (the "**Earnest Money Deposit**") with an escrow agent by no later than **April 15, 2020** (the "**Bid Deadline**"). The Stalking Horse Bidder shall deliver an Earnest Money Deposit to the escrow agent by no later than April 1, 2020. Any such Bid submitted by the Bid Deadline shall be in the amount of at least Seven Million Five Hundred Thousand and no/100 Dollars ($7,500,000.00) to be a Qualified Bid and to allow the Bidder to participate in the auction of the Property ("**Qualified Bidder**"). The deposited funds will be held by the escrow agent until after the closing of the Sale. The Earnest Money Deposit of all Qualified Bidders (except for the

Successful Bidder and Back-Up Bidder) will be returned, without interest, to each Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale. The Debtors shall provide PNC Bank, N.A. ("PNC") and the Committee with prompt, written notice each time that they deem a potential bidder to be a Qualified Bidder. Counsel for the following parties may attend any Auction of the Property:

    a. Debtors;

    b. Qualified Bidders;

    c. PNC;

    d. the Committee; and

    e. Southern Glazer's Wine and Spirits, LLC.

7.    The closing of the Sale shall occur no later than April 30, 2020; provided, however, that this requirement may be waived once by agreement between Debtors, PNC the Committee, and the Successful Bidder.

8.    If the Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, Debtors shall conduct an auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on Monday April  20, 2020 at 1:30 p.m., prevailing Central Time (the "**Auction**"). All Qualified Bidders may participate in such Auction.

9.    After conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at  Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on **Thursday April 23, 2020 at 1:30 p.m.**, prevailing Central Time (the "**Sale Hearing**").

10.    Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance

with the Sale Procedures Order)  (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before on or before **April 17, 2020** (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

11.     The Notice of Assumption and Assignment, attached as Exhibit 3 to this Order, is approved, because it (a) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtor and (b) is reasonably calculated to provide due, adequate, and timely notice to all counterparties of (i) the assumption and assignment of the 365 Contracts and rights thereunder, (ii) once designated by a Qualified Bidder as a contract that such bidder desires to assume, the maximum amount and manner offered to satisfy the Cure Costs, and (iii) the deadline to file objections to such assumption and assignment, applicable cure costs (if designated by a Qualified Bidder as a contract that they wish to assume), the existence of any defaults, and/or adequate assurance of future performance.

12.     On or before March 18, 2020, Debtors shall file with the Court and serve via first-class mail on all counterparties to any of the Debtors' executory contracts and unexpired leases (together, the "**365 Contracts**") and all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "**Contract Notice Parties**") a notice of assumption, assignment and sale.

13.     The Notice of Assumption and Assignment shall include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "**Cure Costs**") for each 365 Contract. The Debtors reserve the right to supplement the list of 365 Contracts and provide additional

Notices of Assumption and Assignment for previously omitted 365 Contracts as appropriate, and to remove a 365 Contract from the list of Desired 365 Contracts at any time prior to conclusion of the Sale Hearing, unless the proposed assumption and assignment of any Desired Contract is passed for the Court's consideration to a later date.

14.    Any objections to the assumption and assignment of any 365 Contract identified in a Notice of Assumption and Assignment, including, but not limited to, objections relating to adequate assurance of future performance, conditions to assumption and/or assignment or objections to Cure Costs set forth in a Notice of Assumption and Assignment must be in writing and filed with the Court by the earlier of (a) twenty-one (21) days after the date on which the Notice of Assumption and Assignment is served or (b) the date of the Sale Hearing.

15.    In the event that any bid submitted by a Qualified Bidder requires the assumption and assignment of any executory contract that was not previously the subject of a Notice of Assumption and Assignment, the Debtors shall, within three (3) business days following the receipt of such bid from a Qualified Bidder, cause a supplemental Notice of Assumption and Assignment to be served upon any counterparties to the additional executory contracts specified in such Qualified Bidder's bid.  Any objections to the assumption and assignment of such additional 365 Contracts that are the subject of Notice of Assumption and Assignment must be in writing and filed with the Court by the earlier of (a) twenty-one (21) days after the date on which the supplemental Notice of Assumption and Assignment is served or (b) the date of the Sale Hearing.

16.    If at any time after the entry of the Sale Order, the Debtors identify additional prepetition executory contracts that may be subject to being assumed and assigned to the Successful Bidder, the Debtors shall serve a supplemental notice of assumption and assignment (a

"**Supplemental Notice of Assumption and Assignment Notice**") by facsimile, electronic transmission, hand delivery or overnight mail on the counterparty (and its attorney, if known) to each supplemental 365 Contract at the last-known address available to the Debtors by no later than ten (10) days before the proposed effective date of the assignment. Each such Supplemental Notice of Assumption and Assignment shall set forth (a) the name and address of the 365 Contract counterparty, (b) notice of the proposed effective date of the assignment (subject to the right of Successful Bidder(s) to withdraw such request for assumption and assignment of the 365 Contract prior to the Closing), (c) identification of the 365 Contract, (d) the Cure Costs, if any, to the extent such 365 Contract has been designated for assumption and assignment by a Qualified Bidder, and (e) the proposed adequate assurance, as applicable.

17.     The inclusion of a 365 Contract on the Notice of Assumption and Assignment shall not obligate the Successful Bidder to take assignment of such 365 Contract.  Only those 365 Contracts that constitute 365 Contracts selected by the Successful Bidder pursuant to their final Asset Purchase Agreement will be assumed, assigned and sold to the Successful Bidder, which assumption shall occur effective on the date of the closing of the Successful Bidder's Asset Purchase Agreement, the Successful Bidder retains the right, at any time prior to the Asset Purchase Agreement closing, to add or remove 365 Contracts fir the list of executory agreement that will be acquired by the Successful Bidder.

18.     Within one (1) business day after the conclusion of the Auction, the Debtors will file the Successful Bidder's proposed form of adequate assurance of future performance with the Bankruptcy Court.  Objections to the successful bidder's adequate assurance of future performance must be raised no later than April 22, 2020.

19.     If a counterparty to a 365 Contract files a timely objection asserting a higher cure than the maximum Cure Costs set forth in the Notice of Assignment and Assumption, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under the 365 Contracts, if it is ultimately designated a 365 Contract by a Qualified Bidder, in its sole and absolute discretion, at any time prior to Sale Hearing, to be assumed, assigned, and sold to it in connection with the Proposed Transaction (a "**Desired 365 Contract**"), will also be heard at the Sale Hearing.

20.     If no objection is timely filed and served, the counterparty to a 365 Contract shall be deemed to have consented to the assumption, assignment and sale of the 365 Contract to any Successful Bidder if such 365 Contract is designated by any Successful Bidder, in its sole and absolute discretion, as a Desired 365 Contract and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by any Successful Bidder. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at Sale Hearing. The Cure Costs provided to the contract counterparty shall be controlling, notwithstanding anything to the contrary in any 365 Contract, or any other document, and the counterparty to the 365 Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors or the Successful Bidder(s), or the property of any of them.

21.     Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. To

the extent applicable, the stays described in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

22.     The Debtors, with the written consent of PNC and the Committee, retain the right to: (a) determine whether any Qualified Bid is a successful bid, (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Debtors, with the written consent of PNC and the Committee, determine to be inadequate, insufficient, or not in conformity with the sale procedures.

23.     Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

24.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

### #

**ORDER SUBMITTED BY:**

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Thomas Rice
Texas State Bar No. 24025613
trice@pulmanlaw.com
Amber L. Fly
Texas State Bar No. 24101761
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**ATTORNEYS FOR DEBTORS**

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., | § | BANKRUPTCY NO. 19-52298-RBK |
| | § | |
| DEBTORS | § | CHAPTER 11 CASE |
| | § | |

NOTICE OF SALE OF DEBTORS' ASSETS AND BIDDING PROCEDURES

**PLEASE READ THIS NOTICE CAREFULLY AS YOUR
RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.**

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

On March __, 2020, Debtors filed *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Bid Procedures Motion**") seeking approval of certain procedures for the sale of and taking bids (the "**Sale Process**") on the Debtors' Property. Through this Sale Process, Debtors seek the highest and best offer(s) for the sale of the Property (the "**Sale**") free and clear of any and all liens, claims, rights, interests, and encumbrances in accordance with Section 363(f) of the Bankruptcy Code, with such liens, claims, rights, interests, and encumbrances to attach to the sale proceeds. The Sale Process is subject to, and all offers must be in accordance with, the sale procedures approved by the Bankruptcy Court, which are attached hereto as **Exhibit A** (the "**Bid Procedures**").

On March ___, 2020, the Bankruptcy Court entered its *Order Approving (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* [Docket No. ] (the "**Bid Procedures Order**") in which it, among other things, (a) approved the Bid Procedures, (b) approved the form and manner of notice of the Bid Procedures, (c) set an Objection Deadline to the Sale, and (d) established the date for the Sale.

Any party desiring to make an offer to buy, or a proposal relating to, the Property that is the subject of the Bid Procedures must comply with those Bid Procedures and submit a bid by no later than **April 15, 2020** (the "**Bid Deadline**").

In the event Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, the Debtors shall conduct an auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on **Monday April  20, 2020 at 1:30 p.m.,** prevailing Central Time (the "**Auction**"). All Qualified Bidders may participate in such Auction.

After conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at  Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 **on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time** (the "**Sale Hearing**").

Objections, if any, to the consummation of the Sale, other than objections with respect to the assumption and assignment of executory contracts, shall be filed with the Bankruptcy Court by no later than **April 17, 2020** (the "**Objection Deadline**").  Objections to the assumption and assignment of executory contracts must be submitted before the deadlines set forth in the Bid Procedures Order, which generally provides that such objections must be filed and served within the earlier of (x) twenty-one (21) days after the service of a notice of potential assumption of such executory contracts and (y) the date of the Sale Hearing.

Any person failing to timely file an objection to the Sale prior to the deadlines set forth in the Bid Procedures Order shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Thomas Rice*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Thomas Rice
    Texas State Bar No. 24025613
    trice@pulmanlaw.com
    Amber F. Fly
    Texas State Bar No. 24101761
    afly@pulmanlaw.com

**ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION**

# EXHIBIT A

## SALE PROCEDURES

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

These Sale Procedures have been approved and authorized pursuant to the Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts (the "**Sale Procedure Motion**") and the *Order Approving Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. Assets to be Sold

Debtors seek to consummate the Proposed Transactions with NH (as defined in the Sale Procedure Motion), including the sale of substantially all of their assets, as defined in the Sale Procedure Motion and draft Asset Purchase Agreement, which is attached to the Sale Procedure Motion. The Property shall be sold free and clear of all claims, encumbrances, liens, and interests. Debtors may consider bids from one or more Qualified Bidders for the Property; provided, however, that multiple bidders may not act together pursuant to a collusive agreement between or among them.

Generally, the Property includes all assets, rights, entitlements and privileges of the Debtors' assets and rights of the Debtors, including possibly (a) 32 locations and (b)(i) the assumption and assignment to NH of all leasehold rights in all locations or used in the Debtors' business operations; (ii) the assumption and assignment of all personal-property leases used in the Debtors' business operations and designated by NH in its sole and absolute discretion; (iii) the conveyance free and clear of all liens, claims, encumbrances, and interests of all inventory, furniture, fixture, equipment located at or used in the operation for each of the 32 locations, and (iv) conveyance of all intellectual property related to the operation of the Debtors' businesses, including, without limitation, all patents, permits, licenses, exemptions (including any pre-1949 or pre-1995 permits), trademarks, designs, social-media assets, e-commerce assets, URLs, customer lists, and data associated with the stores to NH free and clear of all liens, claims, encumbrances, and interests (collectively, items (i)-(iv) are the "**Property**") and (c) the acquisition of all stock in the Debtors. the Debtors propose to effectuate the Proposed Transactions, subject to higher and better offers.

The Property currently includes acquisition of the equity interests in Gabriel Investment Group, Inc., a publicly held corporation (the "**PubCo**") that is authorized to own liquor store permits under Section 22.16(f) of the Texas Alcoholic Beverage Code. Debtors will also consider offers seeking to purchase either the PubCo separately or purchase the Liquor Store assets without acquiring the equity interests in PubCo.

The Debtors have set up a data room, which can be accessed by contacting the Debtors' Investment Bankers at:

John J. O'Neill                                    Brad Walker
NTA – A Riverbend Company              NTA – A Riverbend Company
(214) 870-5040                                  (214) 616-6256
joneill@nta-riverbend.com                 bwalker@riverbendssg.com

### B.  <u>Submission of Initial Qualifying Bids by Potential Purchasers</u>

Any person desiring to submit a bid for the Property (a "**Bid**") and to participate in the auction of the Property (the "**Auction**") shall deliver their Bid and an executed copy of an Asset Purchase Agreement to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 dollars ($100,000.00) (the "**Earnest Money Deposit**") with an escrow agent selected by the Debtors, such that the Bid is actually received **by close of business on April 15, 2020** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least $7,500,000 to be a Qualified Bid and to allow that Bidder to participate in the Auction of the Property.

### C.  <u>Stalking Horse Bid</u>

The Court has approved the Stalking Horse Bidder, the Stalking horse Bid, and the bid protections.  The Stalking Horse Bidder and PNC are Qualified Bidders.  If no other Qualified Bids are received, the Stalking Horse Bidder shall be deemed the highest or best bid for the Property, and the Debtors shall seek approval of the Proposed Transactions with the Stalking Horse Bidder on the terms outlined in the Stalking Horse Bid.

### D.  <u>The Auction and Selection of the Successful Bid</u>

If the Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, Debtors shall conduct an Auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on Monday April 20, 2020 at 1:30 p.m., prevailing Central Time and all Qualified Bidders may participate in such Auction.

If multiple Qualified Bids satisfying all requirements are received and Debtors determine to proceed with an Auction as set forth above, each Qualified Bidder (including PNC and the Stalking Horse Bidder) shall have the right to continue to improve its bid at the Auction.

At the Auction, Debtors shall announce the highest or best Qualified Bid received by the Bid Deadline, which Qualified Bid shall be the starting bid at the Auction. The Stalking Horse Bidder shall have the right to make the first overbid.  All subsequent bids shall proceed in the order of receipt.  Qualified Bidders may then improve their Qualified Bids, in increments of at least $100,000.00, overbidding the previous high bid at the Auction.

The Debtors, with the written consent of PNC, the Official Committee of Unsecured Creditors (the "**Committee**") and the Stalking Horse Bidder, retain the right to modify the Overbid Increment during the course of the Auction. By making a Qualified Bid, a Qualified Bidder shall be deemed to have agreed to keep its final Qualified Bid open until closing of the approved Sale.

At the conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at  Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time (the "**Sale Hearing**").

### E.  Objections to Sale

Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance with the Sale Procedures Order) (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before April 17, 2020 (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Any objections to the assignment and/or assumption of any of the Debtors' executory contracts or agreements must be submitted in accordance with the timeline set forth in the Sale Procedure Order, which generally requires that any such objections be filed no later than twenty-one (21) days after service of the applicable assumption and assignment notice.

### F.  Court Approval

At the Sale Hearing, Debtors will seek entry of an order approving the sale of the Property to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Debtors with the approval of PNC, the Committee and the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Debtors of the adjourned date at the Sale Hearing.

Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Debtors' acceptance of the Bid. Debtors will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Property shall occur no later than April 30, 2020 (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Debtors, PNC, the Committee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Property, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estates.

## I. **Back-Up Bidders**

If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), as determined by the Debtors, PNC, and the Committee (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Property and Debtors, with the consent of PNC and the Committee, will be authorized to consummate the Sale of the Property to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Debtors with the consent of PNC and the Committee, until a Qualified Bidder shall consummate the Sale.

## J. **Return of Earnest Money Deposit**

Unless otherwise outlined in the Asset Purchase agreement, the Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

## K. **Reservation of Rights**

1.      <u>Determination of Successful Bid</u>. Debtors, with the written consent of PNC and the Committee, retain the right to: (a) determine whether any Qualified Bid is a successful bid, (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Debtors, with the written consent of PNC and the Committee, determine to be inadequate, insufficient, or not in conformity with the sale procedures.

2.      <u>Modification of Bidding Procedures</u>. Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

## L. **As Is, Where As Sale**

The sale of the Property shall be on an "**as is, where as**" basis and without representations or warranties of any kind, nature, or description by the Debtors, their Estates, or their agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a bid, each Potential Purchaser that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Property prior to makings its bid, (ii) has relied solely

upon its own independent review, investigation and/or inspection of any and all documents and/or the Property in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith.

**M.  Debtor's Counsel**

Any questions regarding these Sales Procedures should be addressed to Debtors' Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
Thomas Rice
trice@pulmanlaw.com
Amber Fly
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

# EXHIBIT 2

## SALE PROCEDURES

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

These Sale Procedures have been approved and authorized pursuant to the Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts (the "**Sale Procedure Motion**") and the *Order Approving Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. <u>Assets to be Sold</u>

Debtors seek to consummate the Proposed Transactions with NH (as defined in the Sale Procedure Motion), including the sale of substantially all of their assets, as defined in the Sale Procedure Motion and draft Asset Purchase Agreement, which is attached to the Sale Procedure Motion. The Property shall be sold free and clear of all claims, encumbrances, liens, and interests. Debtors may consider bids from one or more Qualified Bidders for the Property; provided, however, that multiple bidders may not act together pursuant to a collusive agreement between or among them.

Generally, the Property includes all assets, rights, entitlements and privileges of the Debtors' assets and rights of the Debtors, including possibly (a) 32 locations and (b)(i) the assumption and assignment to NH of all leasehold rights in all locations or used in the Debtors' business operations; (ii) the assumption and assignment of all personal-property leases used in the Debtors' business operations and designated by NH in its sole and absolute discretion; (iii) the conveyance free and clear of all liens, claims, encumbrances, and interests of all inventory, furniture, fixture, equipment located at or used in the operation for each of the 32 locations, and (iv) conveyance of all intellectual property related to the operation of the Debtors' businesses, including, without limitation, all patents, permits, licenses, exemptions (including any pre-1949 or pre-1995 permits), trademarks, designs, social-media assets, e-commerce assets, URLs, customer lists, and data associated with the stores to NH free and clear of all liens, claims, encumbrances, and interests (collectively, items (i)-(iv) are the "**Property**") and (c) the acquisition of all stock in the Debtors. the Debtors propose to effectuate the Proposed Transactions, subject to higher and better offers.

The Property currently includes acquisition of the equity interests in Gabriel Investment Group, Inc., a publicly held corporation (the "**PubCo**") that is authorized to own liquor store permits under Section 22.16(f) of the Texas Alcoholic Beverage Code. Debtors will also consider offers seeking to purchase either the PubCo separately or purchase the Liquor Store assets without acquiring the equity interests in PubCo.

The Debtors have set up a data room, which can be accessed by contacting the Debtors' Investment Bankers at:

John J. O'Neill                         Brad Walker
NTA – A Riverbend Company               NTA – A Riverbend Company
(214) 870-5040                          (214) 616-6256
joneill@nta-riverbend.com               bwalker@riverbendssg.com

### B.  Submission of Initial Qualifying Bids by Potential Purchasers

Any person desiring to submit a bid for the Property (a "**Bid**") and to participate in the auction of the Property (the "**Auction**") shall deliver their Bid and an executed copy of an Asset Purchase Agreement to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 dollars ($100,000.00) (the "**Earnest Money Deposit**") with an escrow agent selected by the Debtors, such that the Bid is actually received **by close of business on April 15, 2020** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least $7,500,000 to be a Qualified Bid and to allow that Bidder to participate in the Auction of the Property.

### C.  Stalking Horse Bid

The Court has approved the Stalking Horse Bidder, the Stalking horse Bid, and the bid protections.  The Stalking Horse Bidder and PNC are Qualified Bidders.  If no other Qualified Bids are received, the Stalking Horse Bidder shall be deemed the highest or best bid for the Property, and the Debtors shall seek approval of the Proposed Transactions with the Stalking Horse Bidder on the terms outlined in the Stalking Horse Bid.

### D.  The Auction and Selection of the Successful Bid

If the Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, Debtors shall conduct an Auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on Monday April 20, 2020 at 1:30 p.m., prevailing Central Time and all Qualified Bidders may participate in such Auction.

If multiple Qualified Bids satisfying all requirements are received and Debtors determine to proceed with an Auction as set forth above, each Qualified Bidder (including PNC and the Stalking Horse Bidder) shall have the right to continue to improve its bid at the Auction.

At the Auction, Debtors shall announce the highest or best Qualified Bid received by the Bid Deadline, which Qualified Bid shall be the starting bid at the Auction. The Stalking Horse Bidder shall have the right to make the first overbid.  All subsequent bids shall proceed in the order of receipt.  Qualified Bidders may then improve their Qualified Bids, in increments of at least $100,000.00, overbidding the previous high bid at the Auction.

The Debtors, with the written consent of PNC, the Official Committee of Unsecured Creditors (the "**Committee**") and the Stalking Horse Bidder, retain the right to modify the Overbid Increment during the course of the Auction. By making a Qualified Bid, a Qualified Bidder shall be deemed to have agreed to keep its final Qualified Bid open until closing of the approved Sale.

At the conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at  Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time (the "**Sale Hearing**").

## E.  Objections to Sale

Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance with the Sale Procedures Order) (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before on or before April 17, 2020 (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Any objections to the assignment and/or assumption of any of the Debtors' executory contracts or agreements must be submitted in accordance with the timeline set forth in the Sale Procedure Order, which generally requires that any such objections be filed no later than twenty-one (21) days after service of the applicable assumption and assignment notice.

## F.  Court Approval

At the Sale Hearing, Debtors will seek entry of an order approving the sale of the Property to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Debtors with the approval of PNC, the Committee and the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Debtors of the adjourned date at the Sale Hearing.

Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Debtors' acceptance of the Bid. Debtors will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

## G.  Closing

The closing of the sale of the Property shall occur no later than April 30, 2020 (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Debtors, PNC, the Committee and the Successful Bidder.

## H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Property, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estates.

## I. **Back-Up Bidders**

If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), as determined by the Debtors, PNC, and the Committee (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Property and Debtors, with the consent of PNC and the Committee, will be authorized to consummate the Sale of the Property to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Debtors with the consent of PNC and the Committee, until a Qualified Bidder shall consummate the Sale.

## J. **Return of Earnest Money Deposit**

Unless otherwise outlined in the Asset Purchase agreement, the Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

## K. **Reservation of Rights**

1.  **Determination of Successful Bid**. Debtors, with the written consent of PNC and the Committee, retain the right to: (a) determine whether any Qualified Bid is a successful bid, (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Debtors, with the written consent of PNC and the Committee, determine to be inadequate, insufficient, or not in conformity with the sale procedures.

2.  **Modification of Bidding Procedures**. Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

## L. **As Is, Where As Sale**

The sale of the Property shall be on an "**as is, where as**" basis and without representations or warranties of any kind, nature, or description by the Debtors, their Estates, or their agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a bid, each Potential Purchaser that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Property prior to makings its bid, (ii) has relied solely

upon its own independent review, investigation and/or inspection of any and all documents and/or the Property in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith.

**M.  Debtor's Counsel**

Any questions regarding these Sales Procedures should be addressed to Debtors' Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
Thomas Rice
trice@pulmanlaw.com
Amber Fly
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

# EXHIBIT 3

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., | § | BANKRUPTCY NO. 19-52298-RBK |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |

### NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WHICH MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO

**You are receiving this *Notice of Executory Contracts and Unexpired Leases Which May Be Assumed and Assigned in Connection With the Sale of Substantially All of the Debtors' Assets and the Proposed Cure Amount With Respect Thereto* (the *"Notice of Assumption and Assignment"*) because you may be a counterparty to an executory contract or unexpired lease with Gabriel Investment Group Inc. et. al. ("Debtors" or "Gabriel's"),[1] Debtors in the above captioned cases (the *"Cases"*). Please read this notice carefully as your rights may be affected by the transactions described herein.**

**PLEASE TAKE NOTICE** that on March [ ], 2020, the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the *"Bankruptcy Court"*) entered an order (the *"Sale Procedures Order"*) approving the *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the *"Sale Procedures Motion"*)*,* filed by the Debtors.[2] The Sale Procedures Order set forth certain procedures (the *"Sale Procedures"*) in connection with the sale of the Debtors' Assets (the *"Sale Transaction"*).

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, the Debtors have established procedures for the assumption, assignment and sale of certain executory contracts and unexpired leases (collectively, the *"365 Contracts"*) to a potential purchaser and the determination of related Cure Costs (as defined herein). Debtors are a party to 365 Contracts and, in accordance with the Sale Procedures Order, hereby file this notice identifying (i) the 365 Contracts which may be assumed and assigned to a Successful Bidder in connection with the Sale Transaction and (ii) the proposed amounts, if any, the Successful Bidder believes are owed

---

[1] The terms "Debtors" and "Gabriel's" as used herein shall mean Gabriel Investment Group, Inc. ("GIG"), Gabriel GP, Inc. ("GP"), Gabriel Holdings, LLC ("Gabriel Holdings"), Don's & Ben's, Inc. ("D&B"), and S.A. Discount Liquor, Inc. ("Discount Liquor") collectively.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Procedures Motion.

to the counterparty to the 365 Contract to cure all defaults or arrears existing under the 365 Contract (the *"Cure Costs"),* both as set forth on **Exhibit 1** attached hereto.

**PLEASE TAKE FURTHER NOTICE** that the listing of a 365 Contract on **Exhibit 1** does not constitute an admission that the agreement is an executory contract or unexpired lease as contemplated by section 365(a) of the Bankruptcy Code or that the Debtors have any liability thereunder, and the Debtors expressly reserve all of their rights, claims, causes of action and defenses with respect to the 365 Contracts listed on **Exhibit 1.**

**PLEASE TAKE FURTHER NOTICE** that any objections to the assumption, assignment, and sale of any 365 Contract identified in this Notice (except with respect to the adequate assurance of future performance by any Successful Bidders), must be (i) in writing and (ii) filed with the Bankruptcy Court by no later than the earlier of (x) twenty-one (21) days from the date of this notice (the "*Assumption and Assignment Objection Deadline*") or (y) the date of the Assumption/Assignment Hearing.  Any such objections must set forth any objection to the possible assumption, assignment, and sale of the 365 Contracts (and must state, with specificity, the legal and factual basis thereof) and, if applicable, the proposed Cure Costs (and must state, with specificity, what Cure Costs are required with appropriate documentation in support thereof).

**PLEASE TAKE FURTHER NOTICE** that if a counterparty to a 365 Contract files a timely objection asserting a higher cure amount than the maximum Cure Costs, and the parties are unable to consensually resolve the dispute prior to the hearing to resolve any such objection, which hearing will be held on April 23, 2020 (the *"Assumption/Assignment Hearing"*), the amount to be paid or reserved with respect to such objection will be determined at the Assumption/Assignment Hearing. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under the 365 Contracts, if it is ultimately designated a 365 Contract that the Successful Bidder proposes be assumed, assigned, and sold to it in connection with the transaction (a **"Desired 365 Contract"),** will also be heard at the Assumption/Assignment Hearing.

**PLEASE TAKE FURTHER NOTICE** that if no objection is timely filed and served, the counterparty to a 365 Contract shall be deemed to have consented to the assumption, assignment and sale of the 365 Contract to any Successful Bidder if such 365 Contract is designated by any Successful Bidder as a Desired 365 Contract and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by any Successful Bidder. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be filed with the Court by **April 22, 2020** and will be resolved at the Assumption/Assignment Hearing. The Cure Costs provided to the contract counterparty shall be controlling, notwithstanding anything to the contrary in any 365 Contract, or any other document, and the counterparty to the 365 Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors or the Successful Bidder, or the property of any of them.

**PLEASE TAKE FURTHER NOTICE** that within one (1) business day after the conclusion of the Auction, the Debtors will file the Successful Bidder's proposed form of adequate assurance of future performance with the Bankruptcy Court.  Objections to the successful bidder's adequate assurance of future performance must be raised no later than April 22, 2020.

**PLEASE TAKE FURTHER NOTICE** that although the Debtors have made a good faith effort to identify all 365 Contracts that may be susceptible to being assumed and assigned in connection with the Sale Transaction, they may discover additional contracts that the Debtors and the Successful Bidder desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Sale Order, the Debtors identify additional prepetition executory contracts that may be subject to being assumed and assigned to the Successful Bidder(s), the Debtors shall serve a supplemental notice of assumption and assignment (the "*Supplemental Assumption and Assignment Notice*") by facsimile, electronic transmission, hand delivery or overnight mail on (i) the counterparty to each supplemental 365 Contract at the last known address available to the Debtors and ii) all parties who have requested notice in these Cases pursuant to Bankruptcy Rule 2002 by no later than ten (10) days before the proposed effective date of the assignment. Each such Supplemental Assumption and Assignment Notice shall set forth (i) the name and address of the contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of Successful Bidder to withdraw such request for assumption and assignment of the contract prior to the Closing), (iii) identification of the Contract, (iv) the Cure Costs, if any, to the extent such 365 Contract has been designated for assumption and assignment by a Successful Bidder, and (v) the proposed adequate assurance.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Assumption and Assignment is subject to the fuller terms and conditions of the Sale Procedures Order, with such Sale Procedures Order controlling in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties with questions regarding the proposed assumption, assignment, and sale procedures contained herein should contact the Debtors' counsel at the contact information provided below.  The inclusion of a 365 Contract on **Exhibit 1** does not mean that such 365 Contract will be assumed or assigned in connection with the Sale Transaction or that the Debtors or any Successful Bidder will make any cure payment in connection with such 365 Contract.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Thomas Rice*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Thomas Rice
    Texas State Bar No. 24025613
    trice@pulmanlaw.com
    Amber F. Fly
    Texas State Bar No. 24101761
    afly@pulmanlaw.com

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

# Exhibit 1

List to be Provided

# EXHIBIT B

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "***Agreement***") is made effective as of [_____], 2020 (the "***Effective Date***") by and between [Nooner Holdings, LTD Entity], a [____] ("***Purchaser***"), and Gabriel Investment Group, Inc., a Texas corporation ("***GIG***"), Gabriel GP, Inc., a Texas corporation ("***GGP***"), Gabriel Holdings, LLC, a Texas limited liability company ("***Holdings***"), Don's and Ben's, Inc., a Texas corporation ("***D&B***"), SA Discount Liquors, Inc., and Texas corporation ("***SADL***"; and together with GIG, GGP, Holdings and D&B, collectively, "***Sellers***"), and, solely with respect to the terms and conditions of <u>Section 6.7</u> hereof, the Noncompete Persons.  The Purchaser and Sellers are collectively referred to herein as the "***Parties***."  Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in <u>ARTICLE XII</u>.

### RECITALS:

WHEREAS, Sellers own, manage and operate the liquor and/or package stores set forth on <u>Schedule 1</u> (the "***Businesses***") in the State of Texas;

WHEREAS, Sellers filed petitions (the "***Petitions***") for relief, commencing cases (collectively, the "***Chapter 11 Case***") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Western District of Texas (the "***Bankruptcy Court***");

WHEREAS, in connection with the administration of the Petitions, Sellers desire to sell to Purchaser, and Purchaser desires to acquire from Sellers, the Assets, subject to the approval of the Bankruptcy Court and all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363 and 365 of the Bankruptcy Code (the "***Transaction***"*); and*

WHEREAS, Purchaser is in the process of obtaining Texas Alcohol and Beverage Commission ("***TABC***") licenses to operate liquor stores at each of the Properties;

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, and subject to entry of the Confirmation Order (as defined herein), the Parties agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF ASSETS

1.1    **Acquisition of Assets**.  Subject to and upon the terms and conditions set forth in this Agreement and subject to the approval of the Bankruptcy Court, on the Closing Date, Sellers shall (and shall cause their Affiliates to) sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall acquire from Sellers (and their Affiliates), all assets, properties and rights, free and clear of all Liens, including the following (the "***Assets***"):

(a)    Subject to Section 1.8, the leases listed on <u>Exhibit A</u> (the "***Leases***");

(b)     The stores set forth on Schedule 1 that are located on the properties subject to the Leases set forth on Schedule A (individually, a "**Property**" and collectively, the "**Properties**");

(c)     All tangible personal property utilized in connection with operating the Businesses, including all tangible personal property and equipment located at the Properties, including those assets set forth on Schedule 1.1(c) (provided that the Parties agree that the Parties may amend such Schedule 1.1(c) following the Auction but prior to the Sale Hearing to reflect any changes to such Schedule) (collectively, the "**Equipment**");

(d)     All inventory of Sellers used in connection with the Businesses, including any such inventory not located on the Properties (the "**Inventory**");

(e)     To the extent possible under applicable Law, the original books and records of Sellers and their Affiliates (including all Tax Returns, working papers, employment and financial records of Sellers and their Affiliates related to the Businesses and including all such books and records maintained by Sellers in an electronic format) relating to the Assets or the Businesses (and, to the extent the original Books and Records are required by Law to be retained by Sellers, copies thereof) ("**Books and Records**");

(f)     Subject to the terms of the TSA and to the extent possible under applicable Law,, all permits, licenses and exemptions (including any pre-1949 or pre-1995 TABC permits) utilized in connection with operating the Businesses, including those set forth on Schedule 1.1(f) (collectively, the "**Permits**");

(g)     All rights, claims, causes of action, defenses and rights of set-off arising with respect to the Assets, the Assumed Contracts or the Businesses;

(h)     All rights in the software and intellectual property related to the operation of the Businesses, including all patents, trademarks, trade names, designs, social-media assets, e-commerce assets, URLs, customer lists, servers and data used in connection with the ownership and operation of the Businesses;

(i)     To the extent transferable, all rights under express or implied warranties from or rights against Sellers' and their Affiliates' suppliers with respect to the Assets or the Assumed Contracts; and

(j)     All of the contracts set forth on Schedule 1.1(j) (the "**Assumed Contracts**").

1.2     **Excluded Assets**.   Notwithstanding any provision of this Agreement to the contrary, the Assets specifically exclude, and Sellers hereby retain and Purchaser does not acquire the assets set forth on Schedule 1.2 (the "**Excluded Assets**").  For the avoidance of doubt, the Excluded Assets are not being assigned, transferred, contributed or conveyed to Purchaser hereunder, and do not constitute Assets.

1.3     **Assignment of Assets**.   Subject to the terms and conditions set forth in this Agreement, at Closing, Sellers shall convey the Assets to Purchaser pursuant to the terms of one or more assignments and bills of sale in substantially the form set forth on Exhibit B attached

2

hereto (the "*Assignments*").  Such Assignments shall be signed by the appropriate Seller(s) and, to the extent required by the Leases, the respective landlords evidencing their consent to the Assignments, such Assignments to be effective on a Property by Property basis upon Purchaser's receipt of a TABC license for the respective Property.

1.4  **Payment of Rent Prior to Effective Date of Assignments**.  Sellers shall pay all rent due under the Leases to the landlords under the leases on or before the Closing Date.  After Closing, Purchaser shall pay all rent due under the Leases to the landlords related to any post-Closing periods.

1.5  **Purchaser Access to Properties After Closing**.  At Closing, Purchaser shall immediately be given access, including all keys and security codes for security systems for access, to all Properties.

1.6  **Assumed Liabilities and Excluded Liabilities**.  On the Closing Date, Purchaser shall assume, and agree to pay, perform, fulfill and discharge, all of the liabilities and obligations associated with the Assets arising from and after the Closing Date (the "*Assumed Liabilities*").  All liabilities and obligations of Sellers and their Affiliates other than the Assumed Liabilities are collectively referred to as the "*Excluded Liabilities*."  Notwithstanding anything in this Agreement to the contrary:  (a) Purchaser does not assume (or intend to assume) or agree to pay, perform, fulfill or discharge any Excluded Liabilities; and (b) all Excluded Liabilities shall be retained by Sellers or the other Persons liable for such obligations.  Without limiting the generality of the foregoing, the Excluded Liabilities expressly include: (x) Taxes of Sellers and Taxes related to any period prior to the Closing Date, whether or not included in any Tax Return; (y) all liabilities relating to or arising out of the Excluded Assets; and (z) all liabilities and amounts related to the Businesses and the Assets arising prior to the Closing Date.

1.7  **Post-Closing Assurances**.  Sellers shall hold in trust for the benefit of, and immediately pay to, Purchaser any amounts that shall be received by Sellers or any of Sellers' Affiliates after the Closing Date that constitute Assets.  Purchaser shall hold in trust for the benefit of, and immediately pay to Sellers, any amounts that shall be received by Purchaser or any of Purchaser' Affiliates after the Closing that constitute Excluded Assets.

1.8  **New Leases**.  Prior to Closing, Purchaser shall, in its sole and absolute discretion, have the right to reject any Lease covering any Property (for any reason or without reason), decline to acquire same as part of the Transaction and negotiate a new lease with the landlord of any affected Property (each a "*New Lease*").  In the event Purchaser elects to negotiate a New Lease, Purchaser may (a) delay Closing until such time as the New Lease is executed, or (b) proceed to Closing and acquire all Assets other than the rejected Lease.  Sellers shall use their commercially reasonable efforts to assist Purchaser's efforts to negotiate and execute any New Lease; provided, however, Sellers shall not be required to incur any cost or expense in Purchaser securing a New Lease.

## ARTICLE II
## PURCHASE PRICE

2.1    **Purchase Price**.  The consideration for the sale by Sellers to Purchaser of the Assets shall be Seven Million and 00/100 Dollars ($7,000,000), subject to adjustment, if any, as set forth in this Agreement.

2.2    **Purchase Price Adjustment**.  The Purchase Price shall be adjusted at Closing as follows:

(a)    If the employment of any employee identified on Schedule 2.2(a) (each a "***Key Employee***") terminates at or prior to Closing, the Purchase Price shall be reduced by an amount equal to [$_____] per terminated Key Employee.

(b)    If Purchaser, in its sole and absolute discretion, determines any Assets are lost, destroyed, damaged, stolen, inoperative or not in good working order (any such Asset being a "***Deficient Asset***"), then the Purchase Price shall be reduced by an amount equal to (A) in the case of a lost, destroyed or stolen Deficient Asset, an amount equal to the fair market value of such Deficient Asset (in original, unblemished condition), and (B) in the case of a damaged Deficient Asset or a Deficient Asset that is not in good working order, the lesser of (1) the actual cost to repair such Deficient Asset, or (2) the fair market value of such Deficient Asset (in original, unblemished condition); provided, however, the Purchase Price reduction calculated pursuant to this Section 2.2(b) shall be reduced by an amount equal to any insurance proceeds received by Purchaser related to such Deficient Asset.

(c)    The Purchaser Price shall be reduced by an amount equal to the estimated dollar value of any outstanding and unused or collected gift cards related to the Businesses as of the Closing Date, if any (such dollar amount being the "***Gift Card Liability Amount***").

2.3    **Calculation of Estimated Adjusted Purchase Price**.  Not less than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a certificate executed by Sellers setting forth Sellers' calculation of the Adjusted Purchase Price pursuant to Section 2.2 and each component relating to such calculation.  Sellers' calculation of the Adjusted Purchase Price shall be prepared and determined as of the Closing Date and prepared in good faith on a basis consistent with the historical accounting methodologies and principals applied by Sellers.  Prior to or on the Closing Date, Purchaser and Sellers shall agree upon any adjustments to the Purchase Price in accordance with the terms of this Agreement (such adjustments being the "***Adjusted Purchase Price***").

## ARTICLE III
## HOLDBACK; CALCULATION OF FINAL ADJUSTED PURCHAS PRICE

3.1    **Purchase Price Holdback**.  At the Closing, Purchaser shall withhold from the payment of the Adjusted Purchase Price the total sum of $335,000 (the "***Holdback Amount***"), which shall consist of the following:  (a) $300,000 shall be withheld funds relating to the Inventory valuations (the "***Inventory Holdback***"), and (b) $35,000 shall be withheld funds relating to the gift card valuations (the "***Gift Card Holdback***").  Said amounts shall be withheld and released in accordance with the terms of this Agreement.

3.2 **Post-Closing Calculation of Inventory and Gift Card Liability**. In connection with Purchase Price adjustments pursuant to Section 2.2 and Section 2.3, after Closing, the Parties shall further adjust the Purchase Price to account for variances in Inventory values and gift card liability in accordance with this Section 3.2 and Section 3.3:

(a) Within 90 days following the Closing, Purchaser shall conduct a physical inventory of the Inventory conveyed at Closing and all outstanding and unused or collected gift cards relating to the Businesses as of the Closing Date and shall deliver to Sellers a certificate (the "***Post-Closing Certificate***") executed by Purchaser setting forth Purchaser's calculation of (i) the value of the Inventory as of the Closing Date (the "***Closing Inventory Value***"), (ii) the value of any outstanding and unused or collected gift cards related to the Businesses as of the Closing Date (the "***Closing Gift Card Liability Amount***"), and (iii) any increases or decreases to the Purchase Price resulting from any differences between (A) the Target Inventory Value and the Closing Inventory Value, and (B) the Gift Card Liability Amount and the Closing Gift Card Liability Amount.

(b) If the Target Inventory Value is less than the Closing Inventory Value, the dollar amount of any such deficiency shall be the "***Inventory Increase Amount.***" If the Target Inventory Value is greater than the Closing Inventory Value, the dollar amount of any such excess shall be the "***Inventory Decrease Amount***."

3.3 **Release of Holdback Amount**. Within ten (10) Business Days of receiving the Post-Closing Certificate, Purchaser and Sellers shall agree upon the manner in which the Holdback Amount shall be released and tender to the other Party any payments due and owing to such Party in accordance with this Section 3.3.

(a) The Parties shall adjust the Adjusted Purchase Price (i) upward by the Inventory Increase Amount, or (ii) downward by the Inventory Decrease Amount.

(i) If there is an Inventory Increase Amount, the amount of such increase shall be released from the Inventory Holdback to Sellers. If the Inventory Increase Amount exceeds $300,000, Purchaser shall pay such excess dollar amount to Sellers.

(ii) If there is an Inventory Decrease Amount, the amount of such decrease shall be retained by Purchaser from the Inventory Holdback. If the Inventory Decrease Amount is less than $300,000, then the difference between $300,000 and Inventory Decrease Amount shall be released to Sellers. If the Inventory Decrease Amount exceeds $300,000, Sellers shall pay such excess dollar amount to Purchaser.

(b) The Parties shall adjust the Adjusted Purchase Price downward for any positive difference between the Closing Gift Card Liability Amount and the Gift Card Liability Amount. The amount of such decrease shall be retained by Purchaser from the Gift Card Holdback. If the amount of such Purchase Price decrease is less than $35,000, then the difference between $35,000 and the Purchase Price decrease shall be released to Sellers. If the amount of

any such Purchase Price decrease exceeds $35,000, Sellers shall pay such excess dollar amount to Purchaser.

The Parties agree that this <u>Section 3.3</u> shall be the sole and exclusive post-Closing remedy regarding the manner in which the Purchase Price is adjusted for Inventory and Gift Card liability valuations.

**ARTICLE IV**
**INSURANCE, INDEMNITY AND RISK OF LOSS**

4.1 **Insurance on Properties**. Sellers shall continue to maintain insurance for the Assets until the effective date of the Assignments, and risk of loss of the Assets remains with Sellers prior to the effective date of the Assignments. Purchaser shall be responsible for insurance for the Assets in accordance with the Leases after the effective date of the Assignments.

4.2 **Indemnity Prior to Effective Date of Assignments**. Sellers shall indemnify and hold Purchaser harmless from and against any costs, damages, liabilities, losses, expenses, Liens or claims (including, without limitation, court costs and reasonable attorneys' fees and disbursements) relating to any event, act, omission or incident relating to the Assets prior to the effective date of the Assignments.

4.3 **Survival**. The Parties agree that this <u>ARTICLE IV</u> shall survive the Closing or the termination of this Agreement.

**ARTICLE V**
**TAXES**

5.1 **Sellers' Obligations**. Sellers shall be responsible for all real and personal property Taxes relating to the Properties and any personal property, inventory or Equipment at the Properties accruing prior to the effective date of the Assignments. Sellers shall be responsible for all sales Taxes related to the operation of the Businesses until the effective date of the Assignments.

5.2 **Purchaser's Obligations**. Purchaser shall be responsible for all real and personal property Taxes relating to the Properties and any personal property, inventory or Equipment at the Properties accruing after the effective date of the Assignments. Purchaser shall be responsible for all sales Taxes related to the operation of the Businesses and sales after the effective date of the Assignments.

**ARTICLE VI**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

6.1 **Representations and Warranties of Sellers**. Sellers hereby jointly and severally make the following representations and warranties to Purchaser as of the Closing Date:

(a) **Seller Organization**. Each Seller has been duly organized and is validly existing under the laws of the state in which such Seller was organized, and is authorized to conduct the business in which it is now engaged in the State of Texas. Subject to the provisions and approvals set forth herein, each Seller has all requisite power and authority to enter into this

Agreement and the other documents and instruments to be executed and delivered by such Seller and to carry out the transactions contemplated hereby and thereby.

(b)　　**Authorization and Binding Obligation**.  Sellers' execution, delivery and performance of this Agreement and the transactions contemplated herein have been and will be duly and validly authorized by all necessary action on the part of Sellers.  This Agreement has been duly signed and delivered by Sellers and constitutes the legal, valid and binding obligations of Sellers, enforceable in accordance with its terms.

(c)　　**Absence of Violation, Conflicting Agreements**.  The execution and delivery of, and the performance by Sellers of their obligations under this Agreement do not, and will not contravene, or constitute a default under, any provision of applicable Law or any agreement, judgment, injunction, order, decree or other instrument binding upon Sellers or to which the Assets is subject, or result in the creation of any Lien on any Assets.

(d)　　**Pending Actions**.  There is no action, suit, arbitration, unsatisfied order or judgment, governmental investigation or proceeding pending, or to the knowledge of Sellers, threatened against Sellers, the Assets or Transaction, which, if adversely determined, could in any material way interfere with the consummation by Sellers of the Transactions.

(e)　　**Permits**.  Schedule 1.1(f) contains a list of all Permits that are required for the operation of the Business as currently conducted and as proposed to be conducted.  Seller currently has all Permits that are required for the operation of the Business as currently conducted. Seller is not in default or violation (and no event has occurred that, with notice, lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit to which Seller is a party and, to the knowledge of Seller, there are no facts or circumstances that could form the basis for any such default or violation.

(f)　　**Brokers and Financial Advisors**.  To the knowledge of Sellers, there is no broker or finder who has claimed or who has the right to claim any fee, commission or other similar compensation by or through Sellers or any of their Affiliates in connection with the transaction contemplated by this Agreement that is to be separately paid or otherwise borne, in whole or in part, by Purchaser.

(g)　　**Existence of Leases and Absence of Breach**.  The Leases are valid, existing and in effect, all rents and other payments due under such Leases through the Closing Date are current and shall have been paid by Sellers at or prior to Closing, and there has been no material breach by Sellers of such Leases that shall have not been cured prior to Closing and assignment of the Leases to Purchaser pursuant to this Agreement.

(h)　　**Title to Owned Property**.  Sellers have clear, fee simple title to the Properties to be leased to Purchaser pursuant to the Leases.

(i)　　**Title to Assets and Absence of Liens**.  After giving effect to the Confirmation Order, (i) Sellers shall have good title to the Assets owned by them and used in connection with the Businesses at the Properties, and (ii) the sale and assignment of the Assets to Purchaser pursuant to this Agreement shall be free and clear of all Liens, claims and encumbrances asserted or that could be asserted with respect to such Assets.

(j)  **Material Contracts**.

(i)  Sellers have made available to Purchaser a copy of each Assumed Contract, together with any and all amendments or modifications thereto through and including the date of this Agreement, and each such copy is correct and complete.  After giving effect to the Confirmation Order, each Assumed Contract is in full force and effect and is valid, binding and enforceable against Sellers and their respective Affiliates, as applicable, and Sellers have not received written notice of termination or unenforceability from any counterparty to any Assumed Contract.

(ii)  Sellers and their Affiliates, as applicable, are not in material breach or default of any Assumed Contract and, to the knowledge of Sellers, no other party to any Assumed Contract is in material breach or default thereof and Sellers have not received (A) any claim of, or notice of claim of, breach, violation or default under any Assumed Contract or (B) any notice of termination or cancellation of any Assumed Contract.

(k)  **Insurance**.  The insurance policies that are owned or maintained by Sellers with respect to the Assets are described on Schedule 6.1(k).  All of such insurance policies are in full force and effect, and all premiums therefor payable for periods prior to the Closing Date have been fully paid.  No notice of cancellation of, or indication of an intention not to renew, any such insurance policy has been received by Sellers.  No event has occurred nor does any fact or condition exist that would render any insurance policy void or voidable or subject any of such policies to cancellation or termination.

(l)  **Labor and Employment Matters**.  No employees of Sellers have been or are represented by a union or other labor organization or covered by any agreement with a union or labor organization, including a collective bargaining agreement.  There is no campaign to establish such representation.  There is no pending or threatened labor dispute involving the Businesses and any of their employees, nor have the Businesses experienced any significant labor interruptions over the past five years.  There are no pending or threatened labor disputes or other material that threaten the success of the Businesses.

(m)  **TABC Exemption**.  As of April 28, 1995, GIG was a public corporation as defined by Section 22.16 of the TABC Code that (i) held a package store permit on April 28, 1995, or (ii) had an application pending for a package store permit on April 28, 1995.  GIG provided to the TABC on or before December 31, 1995, a sworn affidavit stating that GIG satisfied the requirements of Section 22.16(f) of the TABC Code.

6.2  **Representations and Warranties of Purchaser**.  Purchaser hereby makes the following representations and warranties to Sellers as of the Closing Date:

(a)  **Organization and Authority**.  Purchaser has been duly organized and is validly existing under the laws of the State of [_____].  Purchaser has all requisite corporate power and authority to enter into this Agreement and the other documents and instruments to be

executed and delivered by Purchaser and to carry out the transactions contemplated hereby and thereby.

(b)     **Authorization and Binding Obligation**.  Purchaser's execution, delivery and performance of this Agreement and the transactions contemplated herein have been and will be duly and validly authorized by all necessary action on the part of Purchaser.  This Agreement has been duly signed and delivered by Purchaser and constitutes the legal, valid and binding obligations of Purchaser, enforceable in accordance with its terms.

(c)     **Absence of Violation; Conflicting Agreements**.  The execution and delivery of, and the performance by Purchaser of its obligations under this Agreement do not, and will not contravene, or constitute a default under, any provision of applicable Law or any agreement, judgment, injunction, order, decree or other instrument binding upon Purchaser or to which the Property is subject, or result in the creation of any Lien or other encumbrance on any asset of Purchaser.

(d)     **Pending Actions**.  There is no action, suit, arbitration, unsatisfied order or judgment, governmental investigation or proceeding pending or, to the knowledge of Purchaser, threatened against Purchaser or the Transaction, which, if adversely determined, could in any material way interfere with the consummation by Purchaser of the Transaction.

(e)     **Brokers and Financial Advisors**.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser, or has the right to claim any fee, commission or other similar compensation by or through Purchaser in connection with the transactions contemplated by this Agreement.

6.3     **Covenants of Sellers**.  Except as contemplated by this Agreement or with the prior written consent of Purchaser, Sellers hereby covenant and agree:

(a)     not to sell, transfer or further encumber any of the Assets;

(b)     to notify Purchaser in writing of the commencement or assertion of any material claim, suit, action, arbitration, legal, administrative or other proceeding, governmental investigation or tax audit against the Sellers or the Assets, which, if adversely determined, could have a material effect on the Assets or Sellers' ability to consummate the Transactions;

(c)     to use reasonable efforts to operate and maintain the Businesses and Properties in a manner generally consistent with the manner in which it has been operated and maintained prior to the Closing Date;

(d)     to cause to be paid all ad valorem, personal property and sales Taxes due and payable with respect to the Assets or the operation of the Businesses in accordance with the terms of this Agreement;

(e)     not to remove or permit to be removed any of the Assets, and to return any such Assets removed from the Properties prior to the date of this Agreement;

(f)     not to terminate any Key Employees;

(g)     to maintain the insurance required by this Agreement through the applicable dates;

(h)     to obtain an Order of the Bankruptcy Court approving this Agreement and transaction pursuant to section 363 of the Bankruptcy Code, providing that the sale and assignment of the Assets to Purchaser pursuant to this Agreement shall be free and clear of all Liens, claims and encumbrances, if any, asserted or that could be asserted with respect to such Assets, and that any such Liens, claims or encumbrances, if any, shall only attach to the proceeds of the sale received by Sellers and not the Assets sold and assigned to Purchaser pursuant to this Agreement; and

(i)     to pay any fees, compensation or the like owed to any broker or finder who has claimed or who has the right to claim any fee, commission or other similar compensation by or through Sellers or any of their Affiliates in connection with the transaction contemplated by this Agreement.

6.4     **Covenant of Purchaser**.  Except as contemplated by this Agreement or with the prior written consent of Sellers, commencing as of the Closing Date, Purchaser hereby covenants and agrees to exercise reasonable diligence in obtaining its TABC licenses to operate liquor stores at the Properties.

6.5     **Joint Covenants**.

(a)     Sellers and Purchaser shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions, and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.  At and after the Closing, Purchaser and Sellers will, without further consideration, execute and deliver such further instruments and documents and do such other acts and things that the other party may reasonably request in order to effect or confirm the transactions contemplated by this Agreement.

(b)     Sellers shall afford to Purchaser, and to the accountants, counsel, advisors, potential financing sources and representatives of Purchaser, reasonable access during normal business hours throughout the period prior to the Closing Date to all Assets, Available Employees, customers, suppliers, agents, files and Books and Records of the Businesses and, during such period, shall furnish promptly to Purchaser all other information concerning the Businesses as Purchaser may reasonably request.  Following the Closing, to the extent Purchaser reasonably requests, Sellers shall provide Purchaser and its representatives with access to any Books and Records of the Businesses in Sellers' possession for so long as such records are required to be retained.

(c)     Seller shall use its best efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date, all consents and approvals contemplated hereby.  Purchaser and Seller shall use their commercially reasonable efforts to obtain the issuance, or transfer of, all Permits required to be issued, transferred or reissued to Purchaser in connection with the acquisition of the Assets and the operation of the Businesses by Purchaser after the Closing Date. Seller shall use its best efforts, and Purchaser shall use its commercially reasonable efforts to give

and make all notices and reports that Seller or Purchaser is required to make to the appropriate governmental body and other persons in respect of the Permits that may be necessary for the sale of the Assets to Purchaser at the Closing.

6.6     **Employee Matters**.

(a)     For purposes of this Agreement, "***Available Employees***" shall mean all employees of Sellers.

(b)     Not later than fifteen (15) days prior to the Closing Date, Purchaser shall tender to the Available Employees it desires to retain (the "***Offered Employees***"), a written offer of employment (the date of such written offer, the "***Employment Offer Date***"), which shall be subject to: (i) the Closing occurring; and (ii) Purchaser's customary pre-employment screening process and standard terms and conditions of employment.  Each Offered Employee shall have at least five (5) Business Days in which to accept or reject Purchaser' offer of employment.  An Offered Employee who accepts Purchaser' offer of employment (each, a "***Continuing Employee***") in writing shall, subject to the conditions set forth above, become an employee of Purchaser as of the Closing Date.  Notwithstanding anything contained herein to the contrary, the Continuing Employees shall be "employees at will" and nothing in this Section 6.6 shall limit the ability of Sellers or Purchaser to terminate the employment of any Available Employee or Continuing Employee or to revise or terminate any employee benefit plan, program or policy from time to time.

(c)     Sellers will retain responsibility for and continue to pay all hospital, medical, life insurance, disability and other welfare benefit plan expenses and benefits for each Continuing Employee with respect to claims incurred by such Continuing Employee or such Continuing Employee's covered dependents prior to the Closing Date.  All hospital, medical, life insurance, disability and other welfare benefit plan expenses and benefits with respect to claims incurred by any Continuing Employee on or after the Closing Date shall be Purchaser's responsibility in accordance with the terms of any benefit plan maintained by Purchaser for the Continuing Employees.  The Continuing Employees and their eligible dependents who were participants in Sellers' group health and other welfare benefits immediately prior to the Closing shall become participants in the group medical and welfare benefits offered by Purchaser as of the Closing Date.

(d)     As of the Closing Date, with respect to the Continuing Employees, Purchaser shall assume liability for Sellers' obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***"), including the obligation, if any, to provide notice and continuation of coverage to any covered employee or qualified beneficiary (as such terms are defined in section 4980(f) of the Tax Code) who is a Continuing Employee or has a qualifying event (as defined in section 4980(f) of the Tax Code) incident to the transactions contemplated by this Agreement.

(e)     Nothing contained herein express or implied is intended to (i) confer upon any current or former employee of Sellers or Purchaser any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment; or (ii) is intended to confer upon any individual (including employees,

retirees, or dependents or beneficiaries of employee or retirees) any right as a third-party beneficiary of this Agreement.

6.7    **Noncompetitive Covenants**.

(a)    **Prohibited Activities by Sellers and Noncompete Persons**.  As additional consideration for the Purchase Price, Sellers, their Affiliates and the Noncompete Persons will not, directly or indirectly, for themselves or on behalf of or in conjunction with any third Person:

(i)    during the four (4) year period after the Closing date (the "***Noncompete Term***") engage in any capacity, whether as a manager, member, shareholder, owner, partner (limited or general), joint venturer, or otherwise, or in any managerial or advisory capacity, whether as an independent contractor, consultant, advisor, sales representative, or otherwise, in any liquor store, package store, liquor distribution center or any business or venture that directly or indirectly competes with the Businesses (each a "***Competitive Business***") in any county in which any of the Businesses or Assets are located (the "***Territory***");

(ii)    at any time from and after the Closing, directly or indirectly, use, attempt to use, interfere with, or allow any third Person to use, attempt to use or interfere with, the Permits or Purchaser's use of the Permits;

(iii)    during the Noncompete Term, solicit or attempt to induce any Person who is, at that time, or who has been, within six months prior to that time, an employee or consultant of Purchaser to become an employee of Seller or any of its Affiliates; provided, however, nothing herein contained shall prevent Sellers, their Affiliates or the Noncompete Persons from general solicitations for employees consistent with past practices; or

(iv)    during the Noncompete Term, call upon any Person which is, at that time, or which has been, within one year prior to that time, a customer of Sellers, Purchaser or any Affiliates of such Parties within the Territory for the purpose of soliciting or selling services or products of a Competitive Business within the Territory.

Section 6.7(a) shall not be deemed to prohibit Sellers, their Affiliates or the Noncompete Persons from acquiring, as a passive investor with no involvement in the operation of the business, not more than one percent of the capital stock of a Competitive Business the stock of which is publicly traded on a national securities exchange, The Nasdaq Stock Market or over-the-counter.

(b)    **Equitable Relief.**  Because of the difficulty of measuring economic losses to Purchaser as a result of a breach of the covenants in this Section 6.7, because a breach of covenants set forth in Section 6.7 would diminish the value of the Assets and business of Sellers being sold pursuant to this Agreement, and because of the immediate and irreparable damage that could be caused to Purchaser, as applicable, for which it would have no other adequate remedy, Sellers and the Noncompete Persons agree that the covenants in this Section 6.7 may be enforced against them by injunctions, restraining orders and other equitable actions, in all cases without the need to prove actual damages and without the need to post any bond or other form of security.

Nothing herein shall be construed as prohibiting Purchaser from pursuing any other available remedy for such breach or threatened breach, including the recovery of damages.

(c)  **Reasonable Restraint.**  Sellers and the Noncompete Persons agree that the covenants in Section 6.7 are necessary in terms of time, activity and territory to protect Purchaser's interest in the Assets and Businesses being acquired pursuant to this Agreement and impose a reasonable restraint on Sellers and the Noncompete Persons in light of the activities and businesses of Sellers and the Noncompete Persons on the date of the execution of this Agreement and the current plans of Sellers and the Noncompete Persons.

(d)  **Severability; Reformation.**  The covenants in this Section 6.7 are severable and separate, and the unenforceability of any specific covenant shall not affect the continuing validity and enforceability of any other covenant.  If any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth in this Section 6.7 are unreasonable and therefore unenforceable, Purchaser, Sellers and the Noncompete Persons intend that such restrictions be enforced to the fullest extent that the court deems reasonable and this Agreement shall thereby be reformed.

(e)  **Material and Independent Covenant.**  Sellers and the Noncompete Persons acknowledge that their agreements and the covenants set forth in this Section 6.7 are material conditions to Purchaser's agreements to execute and deliver this Agreement and other ancillary agreements and to consummate the transactions contemplated hereby and thereby and that Purchaser would not have entered into this Agreement and the other ancillary agreements without such covenants.  All of the covenants in Section 6.7 shall be construed as an agreement independent of any other provision in this Agreement and the other ancillary agreements.

6.8  **Conduct of Business**.  From the date of this Agreement until the Closing Date, except as expressly contemplated by this Agreement or as otherwise consented to by Purchaser in writing (such consent not to be unreasonably withheld or delayed), Sellers shall (and shall cause their Affiliates to) conduct the Businesses in the ordinary course consistent with past practice and shall make commercially reasonable efforts to preserve intact the Businesses and (solely with respect to the Businesses) the relationships of Sellers with their counterparties to the Assumed Contracts, suppliers and other Persons having material business relationships with the Sellers in connection with the Business and to preserve, maintain and protect the Assets.  Without limiting the generality of the foregoing, Sellers shall (and shall cause their Affiliates to):  (a) maintain and keep the Assets which are tangible assets in substantially as good repair, working order and condition as immediately prior to the date of this Agreement, except for depreciation due to ordinary wear and tear; (b) keep in full force and effect all Permits and all insurance applicable to the Assets comparable in amount and scope of coverage to that maintained immediately prior to the date of this Agreement; (c) comply in all material respects with all applicable requirements of law, rules, regulations, orders, ordinances and directives, whether federal, state, local, foreign, exchange or self-regulatory organization; (d) use commercially reasonable efforts not to take, or fail to take, any action which would result in a breach of any of the warranties or a material inaccuracy in any of the representations contained in Section 6.1 or a failure of any of the Closing conditions set forth in Section 9.1 to be satisfied; (e) not subject to any Lien any of the Assets or grant any interest in, right to or any license of, any of the Assets; (f) not make any material change in any method of accounting, keeping of books of account or accounting practices or in any

material method of Tax accounting of Sellers or any of their subsidiaries unless required by a concurrent change in GAAP or applicable Law or upon prior written notice to Purchaser, in order to comply with any GAAP requirements or Financial Accounting Standards Board interpretations or in order to comply with the view of Sellers' independent auditors; and (g) not enter into any agreement or make any commitment to take any of the type of action prohibited in this sentence.

**BANKRUPTCY MATTERS**

7.1 __Bid Procedures__. On or before March 9, 2020, Sellers shall file a motion with the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, requesting entry of the Bidding Procedures Order (the "***Bidding Procedures Motion***"). The Bidding Procedures Motion shall seek to secure entry of the Bidding Procedures Order by March 12, 2020. The Bidding Procedures Order shall (a) schedule a hearing to confirm the chapter 11 plan authorizing the sale proposed in this Agreement and the acquisition of the GIG equity interests (the "***Plan***") no later than April 30, 2020 (the "***Confirmation Hearing***"), and (b) approve certain bid protections, including, among others, the following ("***Bid Protections***")*:*

(a) **Hearing on Bid Procedures**. The Bidding Procedures Motion shall seek to schedule the hearing to approve the Bidding Procedures Order no later than March 16, 2020;

(b) **Notice, Qualified Bids, Etc.** The Bidding Procedures Order must establish notice requirements of the Plan and bid procedures that are satisfactory to Purchaser;

(c) **Cure Notice and Dispute Procedures**. The Bidding Procedures Order must establish cure-claim notice and dispute procedures relating to the assumption and sale and assignment of Assumed Contracts that are satisfactory to Purchaser. Sellers shall serve on all counterparties to all contracts and leases that may be designated by Purchaser as an Assumed Contract a notice specifically stating that Sellers are or may be seeking the assumption and assignment of those contracts and leases and shall notify such parties of the deadline for objecting to the amounts listed on that notice, which deadline shall not be less than twenty (20) days prior to the Confirmation Hearing. If Sellers are unable to establish that a default exists, the proposed Cure Cost shall be $0.00.

(d) **Plan Incorporation**. The Bidding Procedures Order must provide that its terms and conditions, including Bid Protections, will be incorporated in the Plan.

7.2 __Stalking Horse Fee__. Sellers acknowledge that (a) Purchaser made and will continue to make a substantial investment of management time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement and the Transaction, its due diligence of Seller's business and assets, and Seller and its effort to consummate the transactions contemplated hereby, (b) Purchaser's efforts have substantially benefitted and will continue to substantially benefit Sellers and the bankruptcy estate through the submission of the offer that is reflected in this Agreement and Plan and that will serve as the minimum bid on which other potential interested bidders can rely, thus increasing the likelihood that the price at which the Assets are sold will reflect its true worth, and (c) the Stalking Horse Fee and other Bid Protections identified in this Agreement, the Bidding Procedures Motion, and the Plan are necessary to induce Purchaser to make the offer in this Agreement to purchase the Acquired Assets and must be approved by the Bankruptcy Court. Therefore, in consideration and

as compensation for the value provided to Sellers and the bankruptcy estates by Purchaser, Purchaser will be entitled to receive from Sellers a flat-fee payment (not dependent on amounts actually expended or incurred by Purchaser) in cash or other immediately available good funds in an amount equal to $300,000 (the "***Break Up Fee***"), plus $75,000 as reimbursement for Purchaser's expenses in connection with this Agreement (the "***Expense Reimbursement***"; and together with the Break Up Fee, the "***Stalking Horse Fee***") if Purchaser is not the Purchaser of the Assets and the Plan is not confirmed.

7.3     **Timing and Priority of Stalking Horse Fee**.  The Bidding Procedures Motion shall seek Bankruptcy Court approval of payment of the Stalking Horse Fee.  The Break Up Fee and the Expense Reimbursement shall both be entitled to administrative-expense priority (§§ 503(b)(1)(A) and 507(a)), senior to all administrative expenses allowable, other than super-priority administrative claims of PNC Bank, N.A. for failed adequate protection, and payable to the Purchaser if the Purchaser is not the Purchaser of the Assets and the Plan is not confirmed.  The Break Up Fee and the Expense Reimbursement shall be subordinate to PNC Bank N.A.'s outstanding secured and super-priority administrative claims for failed adequate protection.

7.4     **Minimum Initial Overbid**.   The Bidding Procedures Motion shall seek Bankruptcy Court approval that no bid or bids shall be a Qualified Bid, or otherwise considered by Sellers for any purpose, unless (a) the total consideration to be paid to Sellers for the Acquired Assets is in an amount that is greater than (i) the sum of the Purchase Price, **plus** the Break Up Fee, **plus** the Expense Reimbursement, **plus** $125,000 (collectively the "***Initial Overbid***"), (b) all overbids after the Initial Overbid are in increments equal to $100,000, and (c) such bids are otherwise on terms no less favorable to Sellers than those set forth in this Agreement.

7.5     **Deposit**.   If Purchaser completes its due diligence to Purchaser's reasonable satisfaction, then on or before April 1, 2020 (the "***Deposit Date***"), Purchaser shall deposit One Hundred Thousand and no/100 dollars ($100,000.00) (the "***Earnest Money Deposit***") to a third party escrow agent approved in writing by Purchaser.  If the sale is consummated pursuant to the terms and conditions of this Agreement, at Closing the Earnest Money Deposit and all interest earned thereon shall be paid to Sellers and applied to the Purchase Price.  If either Seller or Buyer terminates this Agreement in accordance with any right to terminate granted by this Agreement, the Earnest Money Deposit and all interest accrued thereon shall be immediately disbursed in accordance with the terms and conditions of this Agreement.

7.6     **Good-Faith Finding, etc**.  The order approving this Agreement and the Plan (the "***Sale/Confirmation Order***") must contain, among other things, the following provisions:

(a)     Finding that (i) notice of the Plan was proper and sufficient under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court's Local Bankruptcy Rules, (ii) Sellers and Purchaser entered in this Agreement in good faith and at arm's length, (iii) the consideration paid by Purchaser in this Agreement and the Plan constitutes fair value in consideration for the Assets, and (iv) Purchaser is a good-faith purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code concerning the transactions contemplated in this Agreement;

(b)       Authorizing the Purchaser to acquire the equity ownership interests in GIG free and clear of all Liens, with all such Liens attaching to the proceeds of sale, if any;

(c)       Authorizing Sellers to transfer (or cause their Affiliates to transfer) to Purchaser all rights, title, privileges, and interests of Sellers (and their Affiliates) in and to the Assets free and clear of all Liens, with all such Liens attaching to the proceeds of sale, if any;

(d)       Authorizing Sellers to assume and sell, transfer, and assign the Assumed Contracts to Purchaser pursuant to the Bankruptcy Code;

(e)       Finding that Purchaser is not a successor to Sellers, their Affiliates or Sellers' or their Affiliates' bankruptcy estates by reason of any theory of law or equity with respect to any Lien against Sellers, their Affiliates, Sellers' or their Affiliates' estates or any Acquired Asset;

(f)       Finding that the debts owed by the Debtors are discharged; and

(g)       Establishing the Cure Costs, if any, with respect to curing any defaults or actual pecuniary losses under or with respect to the Assumed Contracts.

7.7       **Miscellaneous**.  Should overbidding on the Assets take place, Purchaser shall have the right, but not the obligation, to participate in the overbidding.  Notwithstanding anything to the contrary, if Purchaser is not the purchaser of the Assets and the Plan is not approved, Purchaser shall still be entitled to the Stalking Horse Fee.  Purchaser shall have the right to credit bid the amount of the Stalking Horse Fee as part of any bid made by Purchaser. If there is a credit bid (the "*Credit Bid*") for the Assets by a third party, then the Credit Bid shall have a cash component equal to the sum of the Break Up Fee and the Expense Reimbursement. For the avoidance of doubt, Purchaser shall be allowed to bid the Break Up Fee and Expense Reimbursement in any subsequent bids.

7.8       **Service of the Bidding Procedures Motion, etc**.  Sellers shall comply with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining the Sale/Confirmation Order, and serving notice of the Bidding Procedures Motion, the Plan, and all objections to the Bidding Procedures Motion and the Plan. Sellers shall serve a copy of a notice of the Bidding Procedures Motion, the Plan, and the objection deadlines thereto  (which such notice shall be approved by Purchaser in advance) in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure on all (a) Persons in the Chapter 11 Case who may possess or assert a Lien in or against the Acquired Assets, (b) all non-debtor parties to an Assumed Contract, (c) Governmental Entities, (d) all Creditors, (e) other Persons required by any order of the Bankruptcy Court (including any omnibus notice or case management order entered in the Bankruptcy Case), and (f) to the extent appointed, counsel to the official committee of unsecured creditors appointed in the Chapter 11 Case (the "*Creditors' Committee*") (collectively, the "*Required Creditor Notices*").

7.9       **Review and Comment of the Bidding Procedures Motion and the Plan**.  Sellers shall provide Purchaser with a copy of the Bidding Procedures Motion, the Plan, and the proposed order approving the Plan (the "*Confirmation Order*").  Sellers shall also provide Purchaser a reasonable opportunity to review and comment on the Bidding Procedures Motion, the Bidding

Procedures Order, the Plan, and the Confirmation Order; provided, however, that Purchaser shall have not less than seven (7) Business Days to review and comment on the Bidding Procedures Motion, the Bidding Procedures Order, the Plan, and the Confirmation Order. Sellers shall incorporate Purchaser's comments into the Bidding Procedures Motion, the Bidding Procedures Order, the Plan, and the Confirmation Order.

7.10  **Cooperation**.  Sellers and Purchaser shall use their respective commercially reasonable efforts to cooperate, assist and consult with each other to secure entry of the Bidding Procedures Order and the Confirmation Order.  If a Person seeks a stay of the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement or the ancillary agreements, Sellers and Purchaser will cooperate reasonably in taking such steps diligently to defend against such stay petition and Sellers and Purchaser shall use their commercially reasonable efforts to obtain an expedited resolution of any such stay petition.  If the Bidding Procedures Order or the Confirmation Order is appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal. Purchaser shall not make any filing in the Bankruptcy Court concerning the Bidding Procedures Motion, the Bidding Procedures Order, the Plan, or the Confirmation Order (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) that would could result in the failure of the transactions contemplated hereby.  This Agreement and the transactions contemplated in this Agreement are subject to the approval by the Bankruptcy Court of (a) the Bidding Procedures Order and (b) the Confirmation Order. The Bidding Procedures Order and the Confirmation Order must be acceptable to Purchaser.

7.11  **Fees and Expenses**.  Each Party shall pay its respective legal and accounting fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all other agreements, documents and instruments executed pursuant hereto and any other costs and expenses incurred by such party, except as otherwise expressly set forth in this Agreement.  This section does not impact Purchaser's ability to recover the Stalking Horse Fee. **Conditions of Obligations of Purchaser Parties and Sellers**.  In addition to the conditions precedent set forth in <u>ARTICLE IX</u>, the respective obligations of each Party to effect the Transaction shall be subject to the satisfaction of the following conditions: The Bankruptcy Court shall have entered in the Chapter 11 Case the Confirmation Order (together with any related findings of fact or conclusions of law) approving this Agreement, the ancillary agreements and the Transaction on or before April 30, 2020.The Bidding Procedures Order and the Confirmation Order entered by the Bankruptcy Court are in form and substance satisfactory to Purchaser, and such orders shall have become final orders.

(c)     The Confirmation Order shall not have been vacated, stayed, amended, reversed and/or modified and either:  (i) the time to appeal the Confirmation Order has expired and such order is no longer subject to appeal or further judicial review; or (ii) the Confirmation Order makes an express finding that Purchaser is a good-faith purchaser entitled to the benefits of section 363(m) of the Bankruptcy Code.

(d)     The Stalking Horse Fee and other Bid Protections identified in this Agreement and the Bidding Procedures Motion shall be approved by the Bankruptcy Court.

(e)     No action, suit or proceeding (including any proceeding over which the Bankruptcy Court has jurisdiction under 28 U.S.C. §§ 157(b) and (c)) brought by any

Governmental Entity or Person shall be pending that would materially alter, enjoin, restrain or prohibit the Transaction, or that would be reasonably likely to interfere with or make illegal the Transaction.

(f)     The Confirmation Order shall provide and declare that all right, title, and interest of Sellers and their Affiliates in and under the Assets and the Assumed Contracts (with the exception of the Assumed Contracts for which any right to consent given to a third party is determined by the Bankruptcy Court to be enforceable and necessary and which consent has not been given), upon Closing, will be transferred and assigned to, and fully and irrevocably vest in, Purchaser and remain in full force and effect. The Confirmation Order shall also declare and include or be accompanied by findings of fact and conclusions of law of the Bankruptcy Court, substantially on the terms set forth in this Section 7.12(f), which, among other things, shall determine and declare, except as would not have a material effect on the Transaction, that:

(i)     to the extent any objection to the Plan exists, each such objection shall have been withdrawn or overruled;

(ii)     the terms of this Agreement, the ancillary agreements and the Transaction are approved, and the execution of and performance under this Agreement and the ancillary agreements by Sellers is ratified and approved, and Sellers are authorized to execute and deliver any and all agreements and documents and take any and all actions necessary to consummate this Agreement, the ancillary agreements and the Transaction;

(iii)     the sale of the Assets and assumption and assignment of the Assumed Contracts are approved pursuant to the Bankruptcy Code;

(iv)     effective at the Closing, all of Sellers' and their Affiliates' right, title and interest in and to the Assets shall be sold, conveyed, assigned, transferred and delivered to Purchaser free and clear of any and all Liens and free and clear of all claims of Sellers and any Affiliate of Sellers, including all claims of the estates of any Affiliate of Sellers that is a debtor in a pending Chapter 11 case as of the Closing Date, and including any Liens granted and imposed by the Bankruptcy Court;

(v)     each Assumed Contract shall remain in full force and effect with respect to Purchaser, any defaults of Sellers and their Affiliates thereunder (other than default or breach that directly resulted from (A) the filing of the Petitions or (B) violation of a financial covenant) shall have been, or Purchaser or Sellers shall have provided adequate assurance that any such defaults shall be, promptly cured (which defaults, as between Sellers and all parties to such Assumed Contracts other than Sellers, shall for all purposes be deemed irrevocably cured by Purchaser' provision of adequate assurance), and all of the Assumed Contracts, with the exception of the Assumed Contracts for which any right to consent given to a third party is determined by the Bankruptcy Court to be enforceable and which consent has not been given, shall be assigned to Purchaser without the execution of any further documents or instruments, and any provisions in any contract that prohibit

or condition the assignment of such contract constitute unenforceable anti-assignment provisions which are void and of no force and effect;

(vi)     the Bankruptcy Court retains exclusive jurisdiction to interpret, construe and enforce the provisions of this Agreement and the ancillary agreements and the Confirmation Order; provided, however, that, in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter;

(vii)     the Bankruptcy Court retains jurisdiction to resolve any and all disputes that may arise under this Agreement as between the Parties, and retains jurisdiction to hear and determine any and all disputes between the parties hereto, as the case may be, and any counterparty to, among other things, any Assumed Contracts, concerning, *inter alia*, Sellers' and their Affiliates' assignment thereof to Purchaser under this Agreement and any such counterparty's claims arising under any agreements relating to Excluded Liabilities;

(viii)     all other requirements and conditions under the Bankruptcy Code for the sale of the Assets by Sellers and their Affiliates to Purchaser and the assumption by and assignment to Purchaser of each Assumed Contract have been satisfied;

(ix)     upon Closing, in accordance with the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all right, title and interest of each of the Assets and the Assumed Contracts (with the exception of any Assumed Contract for which any right to consent given to a third party is determined by the Bankruptcy Court to be enforceable and which consent has not been given), and that, following the Closing, each such Assumed Contract shall remain in full force and effect;

(x)     the sale of the Assets and transfers, sale, and assignments of each Assumed Contracts are in good faith under the Bankruptcy Code, including sections 363(b) and (m) of the Bankruptcy Code;

(xi)     Sellers have complied with the notice requirements of Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable rules of the Bankruptcy Court with respect to the transactions contemplated by this Agreement; and

(xii)     the stays contemplated by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure have been waived.

## ARTICLE VIII
## CLOSING

8.1 **Time and Place**. The closing of the purchase, sale and assignment of the Assets contemplated by this Agreement (the "*Closing*") shall take place on the date this Agreement is approved by the Bankruptcy Court, currently anticipated to be April 30, 2020 (the "*Closing Date*"), unless otherwise agreed to in writing by Sellers and Purchaser. The Closing shall be deemed to take place at the offices of Foley & Lardner LLP, 2021 McKinney Ave., Suite 1600, Dallas, Texas 75201, or such other place as the Parties shall mutually agree. The Parties will deliver required closing documents and funds by overnight delivery service, fax and wire transfers so that all signed documents, Assignments and rents are delivered promptly to the other Party or landlords, as applicable.

8.2 **Sellers' Deliveries at Closing**. At Closing, Sellers shall deliver or cause to be delivered to Purchaser the following:

(a) Fully executed original versions of the Assignments containing signatures of the applicable Sellers and the landlords evidencing their consent to such Assignments; and

(b) A fully executed original version of a transition services agreement in form substantially similar to that set forth on Exhibit C (the "*TSA*").[1]

8.3 **Purchaser's Deliveries at Closing**. At Closing, Purchaser shall deliver or cause to be delivered to Sellers the following:

(a) The Adjusted Purchase Price **minus** the Holdback Amount in immediately available wire transferred funds; and

(b) Executed original versions of the Assignments.

(c) A fully executed original version of the TSA.

**ARTICLE IX**
**CONDITIONS TO CLOSING**

9.1 **Conditions Precedent to Obligations of Purchaser**. The obligation of Purchaser to consummate the Transactions shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a) Sellers shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 8.2;

(b) all of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects as of the Closing;

---

[1] Note to draft: The TSA shall include interim management services in the event one or more Assets cannot be conveyed to Purchaser at Closing due to TABC permitting issues.

(c)     Sellers shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Sellers as of the Closing Date;

(d)     Sellers shall have obtained Bankruptcy Court approval of this Agreement and the Bid Protections;

(e)     there shall be no actions, suits, arbitrations, governmental investigations or other proceedings pending or, to the knowledge of Sellers, threatened against Sellers or affecting the Property before any court or governmental authority, an adverse determination of which might materially and adversely affect (i) the operations of the Businesses at the Properties, (ii) Sellers' ability to enter into or perform this Agreement, or (iii) Sellers' title to the Assets;

(f)     Seller shall have retained all Key Employees or decreased the Purchase Price in accordance with the terms of this Agreement for any Key Employee terminated prior to Closing;

(g)     To the extent Purchaser rejects assumption of any Lease, Purchaser shall have received a duly executed New Lease; and

(h)     Purchaser shall have completed all due diligence related to the Transaction to its reasonable satisfaction on or before the Deposit Date.

9.2     **Conditions Precedent to Obligation of Seller**.  The obligation of Sellers to consummate the Transactions shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Sellers in their sole discretion:

(a)     Purchaser shall have delivered to Sellers all of the items required to be delivered to Sellers pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 8.3;

(b)     all of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date; and

(c)     Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date.

## ARTICLE X
## TERMINATION

10.1     **Termination by Purchaser**.  Purchaser may terminate this Agreement, if not then in material default, upon written notice to Sellers, upon the occurrence of any of the following (after giving effect to any right of Sellers to cure provided herein):

(a)     if Sellers breach in any material respect any of their obligations or representations or warranties contained in this Agreement;

(b)     if the transaction contemplated by this Agreement is not consummated due to any default by Sellers hereunder;

(c)     if Purchaser is not declared the winning bidder upon completion of the Auction;

(d)     by Purchaser if (i) Sellers (A) file a chapter 11 plan that does not include the Transaction, or (B) enter into a contract related to an Alternative Transaction, or (ii) an Alternative Transaction is proposed to the Bankruptcy Court for approval; or

(e)     if any other failure of a condition precedent set forth in <u>Section 9.1</u> occurs;

If Purchaser terminates this Agreement pursuant <u>Section 10.1</u> prior to Closing, Purchaser shall be entitled, as its sole remedy, to receive from the escrow agent the Earnest Money Deposit. For the avoidance of doubt, Purchaser may terminate this Agreement prior to the Deposit Date and will have no obligation to deliver the Earnest Money Deposit or otherwise consummate the Transaction.

10.2   **Termination by Sellers**. Sellers may terminate this Agreement, if not then in material default, upon written notice to Purchaser, upon the occurrence of any of the following:

(a)     if Purchaser breaches in any material respect any of its obligations or representations or warranties contained in this Agreement;

(b)     if the Transactions are not consummated due to any default by Purchaser hereunder;

(c)     by written notice of Sellers to Purchaser that, in accordance with the exercise of Sellers' fiduciary duties under the Bankruptcy Code, they have determined to pursue an Alternative Transaction rather than consummating the Transaction with Purchaser hereunder; or

(d)     if any other failure of a condition precedent set forth in <u>Section 9.2</u> occurs.

After the Deposit Date, if Seller terminates this Agreement pursuant <u>Section 10.2(a)</u> or <u>Section 10.2(b)</u> prior to Closing, Seller shall be entitled, as its sole remedy, to receive from the escrow agent the Earnest Money Deposit. Seller is not entitled to specific performance of the terms of this Agreement.

10.3   **Termination by Mutual Consent; Outside Date**. This Agreement may be terminated at any time before the Closing by mutual written consent of Sellers and Purchaser. This Agreement shall terminate automatically without further action of the Parties if neither Party is in breach of this Agreement and Closing does not occur on or before May 15, 2020. If this Agreement terminates after the Deposit Date pursuant to this <u>Section 10.3</u>, Purchaser shall be entitled, as its sole remedy, to receive the return of the Earnest Money Deposit.

**ARTICLE XI**
**MISCELLANEOUS**

11.1    **Binding Effect: Assignment; No Third Party Beneficiaries**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Purchaser may not assign its rights under this Agreement without first obtaining Sellers' written approval, which approval may be given or withheld in Seller's sole discretion, except that Purchaser may assign all or any portion of its rights hereunder at Closing to one or more Affiliates of Purchaser without Sellers' consent, however, any such assignment shall not relieve Purchaser of its obligations under this Agreement.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.

11.2    **Legal Expenses**.  Should either Party default in the performance of any of the terms or conditions of this Agreement, which default results in the filing of a lawsuit for damages, specific performance or other permitted remedy, the prevailing Party in such lawsuit shall be entitled to its reasonable legal fees and expenses, including such fees and expenses at the appellate level.  Except as otherwise provided in this Agreement, Purchaser and Sellers shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and any other agreement, document or instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

11.3    **Submission to Bankruptcy Court's Jurisdiction**.  Sellers and Purchaser hereby irrevocably agree to submit to the jurisdiction of the United States Bankruptcy Court for the Western District of Texas to resolve any claim or dispute arising out of or related to this Agreement.  Sellers and Purchaser agree that this Section 11.3 shall survive the Closing or the earlier termination of this Agreement.

11.4    **Governing Law**. This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Texas, without regard to the choice of law provisions thereof.

11.5    **Construction**.  The Parties acknowledge and agree that this Agreement has been fully negotiated between them and shall not be interpreted or construed against the drafting party.

11.6    **Notices**.  All notices, demands, requests or other communication required or permitted hereunder shall be in writing and shall be deemed effective when (a) personally delivered to the address of the Party to receive such notice set forth below, (b) transmitted if sent via facsimile or email (with confirmation of successful transmission), (c) the next succeeding day after deposit with a nationally recognized overnight courier service (*e.g.*, Federal Express) and addressed to the Party as set forth below, or (d) two (2) days after the date deposited in any post office or mail receptacle regularly maintained by the United States Postal Service, certified or registered mail, return receipt requested, postage prepaid, addressed as follows (or to such other address which a party shall specify to the other party in accordance herewith):

If to Purchaser:      [Nooner Holdings, LTD Entity]
                    4827 Quarry Run

San Antonio, Texas 78249
Phone:  210.670.6600
Fax:  N/A
Email:  sean@noonerholdings.com
Attn:  Sean Nooner

With a copy to:     Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, Texas 75201
Phone:  [                    ]
Fax:  [                ]
Email:  [                 ]
Attn:  [               ]

If to Sellers:     [Gabriel _____]
10903 Gabriel's Place
San Antonio, Texas 78217
Phone:  210.646.9992
Fax:  210.646.6805
Email:  cgabriel@gabrielspirits.com
Attn:  Cindy Gabriel

With a copy to:     Pulman, Cappuccio & Pullen, LLP
2161 N.W. Military Highway, Ste 400
San Antonio, Texas 78213
Phone:  210.222.9494
Fax:  210.892.1610
Email:  rpulman@pulmanlaw.com
Attn:  Randall Pulman

Notice shall be deemed to have been given on the date of personal delivery, the date set forth in the records of the delivery service, or on the return receipt.

    11.7  **Counterparts and Facsimile Signatures**.  This Agreement may be signed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. Counterpart signatures to the Agreement delivered and received by facsimile shall be acceptable and binding to both parties.

    11.8  **Entire Agreement**.  This Agreement, and any Exhibits hereto, and all documents to be delivered by the Parties pursuant hereto, collectively represent the entire understanding and agreement between Purchaser and Sellers with respect to the subject matter hereof.  This Agreement supersedes all prior memoranda, discussions and agreements between the Parties, and may not be modified, supplemented or amended, except by a written instrument signed by each of the Parties designating specifically the terms and provisions so modified, supplemented or amended.

11.9 **Captions**. The section captions and headings in this Agreement are for convenience and reference purposes only and should not affect in any way the meaning or interpretation of this Agreement.

11.10 **No Waiver**. Unless otherwise specifically agreed in writing to the contrary, (a) the failure of any Party at any time to require performance by the other of any provision of this Agreement shall not affect such Party's right thereafter to enforce the same; (b) no waiver by any Party of any default by another shall be taken or held to be a waiver by such Party of any other preceding or subsequent default; and (c) no extension of time granted by any Party for the performance of any obligation or act by any other Party shall be deemed to be an extension of time for the performance of any other obligation or act hereunder.

11.11 **Interpretation**. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article, as applicable, of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any person or entity by virtue of the authorship of any of the provisions of this Agreement.

**ARTICLE XII**
**DEFINITIONS**

"***Affiliate***" of a Person means any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned Person.

"***Alternative Transaction***" means a transaction or chapter 11 plan in which (a) Sellers sell, transfer or otherwise dispose of, directly or indirectly, all or substantially all, or any material portion, of the Assets to a Person other than Purchaser (or one of its Affiliates), whether through an asset sale, stock sale, merger or any other transaction or (b) the consummation of such transaction or chapter 11 plan that would be inconsistent with the transactions contemplated in this Agreement.

"***Auction***" means the sale of the Assets by Sellers at public auction if a Qualified Bid other than the bid by Purchaser in this Agreement is received by Sellers pursuant to the Bidding Procedures Order.

"***Bidding Procedures Order***" means the order entered by the Bankruptcy Court approving the bidding procedures set forth in the Bidding Procedures Motion in a form and substance reasonably acceptable to Purchaser.

"***Business Day***" means any day that is not a Saturday, Sunday or a day on which the banks in the State of Texas are permitted or required by Law to close.

"*Cure Costs*" means all liabilities, obligations, and amounts, if any, necessary to cure all defaults, if any, and to pay all costs necessary under 11 U.S.C. § 365 for assumption and assignment of the Assumed Contracts, which amounts shall be identified to Purchaser prior to the Closing (which schedule shall be agreed by Purchaser and Sellers prior to the Closing Date or such other time as the parties may agree).

"*GAAP*" means U.S. generally accepted accounting principles.

"*Governmental Entity*" means any federal, state, provincial, local, county or municipal government, governmental, judicial, regulatory or administrative agency, commission, board, bureau or other authority or instrumentality, domestic or foreign.

"*Law*" means, any applicable statute, law (including common law), ordinance, regulation, rule, ruling, order, writ, injunction, decree, investigation or other official act of or by any Governmental Entity.

"*Lien*" means any Lien, interest, pledge, charge, right, privilege, option and other right of ownership, attachment, restriction (whether on voting, sale, transfer, disposition, or otherwise), claim, mortgage, deed to secure debt, deed of trust, conditional sale or other title retention agreement, security interest, security title, easement, license, lease and other right of usage, and any other encumbrance of any kind, type and description, whether imposed by applicable law, agreement understanding, or otherwise, including "Lien" (as defined in section 101(37) of the Bankruptcy Code) and any "claim" (as defined in section 101(5) of the Bankruptcy Code), including any successor-liability claim and pension liability; provided, however, that a financing statement filed by the lessor of equipment to evidence its leasehold interest in such equipment shall not constitute a Lien.

"*Noncompete Persons*" means each of Inez Cindy Gabriel, Jennifer Barbaro, John D. Gabriel, Sr., Rosalie Gabriel, John Deep Gabriel, Jr., Ronald A. Gabriel, Roslyn Gabriel, The Hargrove Children's Trust of 201 Brooke Lee Hargrove GIG Inc S Trust, The Hargrove Children's Trust of 201 Gabrielle Lynn Hargrove GIG S Trust, and The Hargrove Children's Trust of 201 William Dillon Hargrove II GIG Trust.

"*Person*" means any individual, corporation, partnership, association, limited liability company, trust, joint venture, unincorporated organization, or other entity or group (as defined in section 13(d)(3) of the Securities Exchange Act of 1934, as amended).

"*Qualified Bid*" has the meaning set forth in the Bidding Procedures Order.

"*Sale Hearing*" means the hearing scheduled and held by the Bankruptcy Court on the approval of the sale of the Assets under this Agreement.

"*Target Inventory Value*" means $5,000,000.

"*Tax*" means any and all federal, state, local, foreign and other taxes, levies, fees, imposts, duties, governmental fees and charges of whatever kind (including any interest, penalties or additions to the tax imposed in connection therewith or with respect thereto and any interest in respect of such additions or penalties), whether or not imposed on Sellers, including taxes imposed

on, or measured by, income, franchise, profits, gross income or gross receipts, and also ad valorem, value added, sales, use, service, real or personal property, capital stock, stock transfer, license, payroll, withholding, employment, social security, workers' compensation, unemployment compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, environmental, transfer and gains taxes and customs duties.

"***Tax Return***" means all returns, reports, information statements, elections, declarations, disclosures, schedules, estimates, information returns, and other documentation (including any additional or supporting materials) filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment or collection of any Tax and shall include amended returns required as a result of examination adjustments made by the Internal Revenue Service or other Tax authority.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

<u>**Purchaser:**</u>                                              <u>**Sellers:**</u>

[NOONER HOLDINGS, LTD ENTITY]              GABRIEL INVESTMENT GROUP, INC.


By:_____        By:_____
Name:_____        Name:_____
Title:_____        Title:_____


                                              GABRIEL GP, INC.


                                              By:_____
                                              Name:_____
                                              Title:_____


                                              GABRIEL HOLDINGS, LLC


                                              By:_____
                                              Name:_____
                                              Title:_____


                                              DON'S AND BEN'S, INC.


                                              By:_____
                                              Name:_____
                                              Title:_____


                                              SA DISCOUNT LIQUORS, INC.


                                              By:_____
                                              Name:_____
                                              Title:_____

**Noncompete Persons**:

_____

Inez Cindy Gabriel


_____

Jennifer Barbaro


_____

John D. Gabriel, Sr.


_____

Rosalie Gabriel


_____

John Deep Gabriel, Jr.


_____

Ronald A. Gabriel


_____

Roslyn Gabriel


_____

The Hargrove Children's Trust of 201
Brooke Lee Hargrove GIG Inc S Trust


_____

The Hargrove Children's Trust of 201
Gabrielle Lynn Hargrove GIG S Trust


_____

The Hargrove Children's Trust of 201
William Dillon Hargrove II GIG Trust

**<u>Exhibit A</u>**

**Leases**

## **Exhibit B**

**Form of Assignment**

## Exhibit C

**TSA**

## Schedule 1

## Businesses and Properties

## Schedule 1.1(c)

**Equipment**

## Schedule 1.1(f)

**Permits**

## Schedule 1.1(j)

**Assumed Contracts**

## Schedule 1.2

## Excluded Assets

1. Any equity or ownership interests Sellers may own in any Seller or its Affiliates, including, without limitation, stock, shares, partnership interests, membership interests and similar forms of equity ownership.

2. All contracts of insurance.

3. Documents subject to legal privilege.

4. Cash on hand as of Closing.

**Schedule 2.2(a)**

**Key Employees**

## Schedule 6.1(k)

**Insurance**

# EXHIBIT C

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., | § | BANKRUPTCY NO. 19-52298-RBK |
| | § | |
| DEBTORS | § | CHAPTER 11 CASE |
| | § | |

---

### NOTICE OF SALE OF DEBTORS' ASSETS AND BIDDING PROCEDURES

---

### PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

On March __, 2020, Debtors filed *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Bid Procedures Motion**") seeking approval of certain procedures for the sale of and taking bids (the "**Sale Process**") on the Debtors' Property. Through this Sale Process, Debtors seek the highest and best offer(s) for the sale of the Property (the "**Sale**") free and clear of any and all liens, claims, rights, interests, and encumbrances in accordance with Section 363(f) of the Bankruptcy Code, with such liens, claims, rights, interests, and encumbrances to attach to the sale proceeds. The Sale Process is subject to, and all offers must be in accordance with, the sale procedures approved by the Bankruptcy Court, which are attached hereto as **Exhibit A** (the "**Bid Procedures**").

On March ___, 2020, the Bankruptcy Court entered its *Order Approving (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* [Docket No. ] (the "**Bid Procedures Order**") in which it, among other things, (a) approved the Bid Procedures, (b) approved the form and manner of notice of the Bid Procedures, (c) set an Objection Deadline to the Sale, and (d) established the date for the Sale.

Any party desiring to make an offer to buy, or a proposal relating to, the Property that is the subject of the Bid Procedures must comply with those Bid Procedures and submit a bid by no later than **April 15, 2020** (the "**Bid Deadline**").

In the event Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, the Debtors shall conduct an auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on **Monday April 20, 2020 at 1:30 p.m.,** prevailing Central Time (the "**Auction**"). All Qualified Bidders may participate in such Auction.

After conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 **on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time** (the "**Sale Hearing**").

Objections, if any, to the consummation of the Sale, other than objections with respect to the assumption and assignment of executory contracts, shall be filed with the Bankruptcy Court by no later than **April 17, 2020** (the "**Objection Deadline**"). Objections to the assumption and assignment of executory contracts must be submitted before the deadlines set forth in the Bid Procedures Order, which generally provides that such objections must be filed and served within the earlier of (x) twenty-one (21) days after the service of a notice of potential assumption of such executory contracts and (y) the date of the Sale Hearing.

Any person failing to timely file an objection to the Sale prior to the deadlines set forth in the Bid Procedures Order shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Thomas Rice*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Thomas Rice
    Texas State Bar No. 24025613
    trice@pulmanlaw.com
    Amber F. Fly
    Texas State Bar No. 24101761
    afly@pulmanlaw.com

**ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION**

Gzj kdk/C

# SALE PROCEDURES

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

These Sale Procedures have been approved and authorized pursuant to the Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts (the "**Sale Procedure Motion**") and the *Order Approving Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

## A. <u>Assets to be Sold</u>

Debtors seek to consummate the Proposed Transactions with NH (as defined in the Sale Procedure Motion), including the sale of substantially all of their assets, as defined in the Sale Procedure Motion and draft Asset Purchase Agreement, which is attached to the Sale Procedure Motion. The Property shall be sold free and clear of all claims, encumbrances, liens, and interests. Debtors may consider bids from one or more Qualified Bidders for the Property; provided, however, that multiple bidders may not act together pursuant to a collusive agreement between or among them.

Generally, the Property includes all assets, rights, entitlements and privileges of the Debtors' assets and rights of the Debtors, including possibly (a) 32 locations and (b)(i) the assumption and assignment to NH of all leasehold rights in all locations or used in the Debtors' business operations; (ii) the assumption and assignment of all personal-property leases used in the Debtors' business operations and designated by NH in its sole and absolute discretion; (iii) the conveyance free and clear of all liens, claims, encumbrances, and interests of all inventory, furniture, fixture, equipment located at or used in the operation for each of the 32 locations, and (iv) conveyance of all intellectual property related to the operation of the Debtors' businesses, including, without limitation, all patents, permits, licenses, exemptions (including any pre-1949 or pre-1995 permits), trademarks, designs, social-media assets, e-commerce assets, URLs, customer lists, and data associated with the stores to NH free and clear of all liens, claims, encumbrances, and interests (collectively, items (i)-(iv) are the "**Property**") and (c) the acquisition of all stock in the Debtors. the Debtors propose to effectuate the Proposed Transactions, subject to higher and better offers.

The Property currently includes acquisition of the equity interests in Gabriel Investment Group, Inc., a publicly held corporation (the "**PubCo**") that is authorized to own liquor store permits under Section 22.16(f) of the Texas Alcoholic Beverage Code. Debtors will also consider offers seeking to purchase either the PubCo separately or purchase the Liquor Store assets without acquiring the equity interests in PubCo.

The Debtors have set up a data room, which can be accessed by contacting the Debtors' Investment Bankers at:

John J. O'Neill                                      Brad Walker
NTA – A Riverbend Company                            NTA – A Riverbend Company
(214) 870-5040                                       (214) 616-6256
joneill@nta-riverbend.com                            bwalker@riverbendssg.com

### B.  **Submission of Initial Qualifying Bids by Potential Purchasers**

Any person desiring to submit a bid for the Property (a "**Bid**") and to participate in the auction of the Property (the "**Auction**") shall deliver their Bid and an executed copy of an Asset Purchase Agreement to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 dollars ($100,000.00) (the "**Earnest Money Deposit**") with an escrow agent selected by the Debtors, such that the Bid is actually received **by close of business on April 15, 2020** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least $7,500,000 to be a Qualified Bid and to allow that Bidder to participate in the Auction of the Property.

### C.  **Stalking Horse Bid**

The Court has approved the Stalking Horse Bidder, the Stalking horse Bid, and the bid protections.  The Stalking Horse Bidder and PNC are Qualified Bidders.  If no other Qualified Bids are received, the Stalking Horse Bidder shall be deemed the highest or best bid for the Property, and the Debtors shall seek approval of the Proposed Transactions with the Stalking Horse Bidder on the terms outlined in the Stalking Horse Bid.

### D.  **The Auction and Selection of the Successful Bid**

If the Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, Debtors shall conduct an Auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on Monday April 20, 2020 at 1:30 p.m., prevailing Central Time and all Qualified Bidders may participate in such Auction.

If multiple Qualified Bids satisfying all requirements are received and Debtors determine to proceed with an Auction as set forth above, each Qualified Bidder (including PNC and the Stalking Horse Bidder) shall have the right to continue to improve its bid at the Auction.

At the Auction, Debtors shall announce the highest or best Qualified Bid received by the Bid Deadline, which Qualified Bid shall be the starting bid at the Auction. The Stalking Horse Bidder shall have the right to make the first overbid.  All subsequent bids shall proceed in the order of receipt.  Qualified Bidders may then improve their Qualified Bids, in increments of at least $100,000.00, overbidding the previous high bid at the Auction.

The Debtors, with the written consent of PNC, the Official Committee of Unsecured Creditors (the "**Committee**") and the Stalking Horse Bidder, retain the right to modify the Overbid Increment during the course of the Auction. By making a Qualified Bid, a Qualified Bidder shall be deemed to have agreed to keep its final Qualified Bid open until closing of the approved Sale.

At the conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at   Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time (the "**Sale Hearing**").

### E.  Objections to Sale

Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance with the Sale Procedures Order) (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before on or before April 17, 2020 (the "**Objection Deadline**").  Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Any objections to the assignment and/or assumption of any of the Debtors' executory contracts or agreements must be submitted in accordance with the timeline set forth in the Sale Procedure Order, which generally requires that any such objections be filed no later than twenty-one (21) days after service of the applicable assumption and assignment notice.

### F.  Court Approval

At the Sale Hearing, Debtors will seek entry of an order approving the sale of the Property to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests.  The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Debtors with the approval of PNC, the Committee and the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Debtors of the adjourned date at the Sale Hearing.

Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Debtors' acceptance of the Bid. Debtors will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Property shall occur no later than April 30, 2020 (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Debtors, PNC, the Committee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Property, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estates.

## I.  **Back-Up Bidders**

If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), as determined by the Debtors, PNC, and the Committee (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Property and Debtors, with the consent of PNC and the Committee, will be authorized to consummate the Sale of the Property to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Debtors with the consent of PNC and the Committee, until a Qualified Bidder shall consummate the Sale.

## J.  **Return of Earnest Money Deposit**

Unless otherwise outlined in the Asset Purchase agreement, the Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

## K.  **Reservation of Rights**

1.  <u>Determination of Successful Bid</u>. Debtors, with the written consent of PNC and the Committee, retain the right to: (a) determine whether any Qualified Bid is a successful bid, (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Debtors, with the written consent of PNC and the Committee, determine to be inadequate, insufficient, or not in conformity with the sale procedures.

2.  <u>Modification of Bidding Procedures</u>. Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

## L.  **As Is, Where As Sale**

The sale of the Property shall be on an "**as is, where as**" basis and without representations or warranties of any kind, nature, or description by the Debtors, their Estates, or their agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a bid, each Potential Purchaser that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Property prior to makings its bid, (ii) has relied solely

upon its own independent review, investigation and/or inspection of any and all documents and/or the Property in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith.

**M.  Debtor's Counsel**

Any questions regarding these Sales Procedures should be addressed to Debtors' Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
Thomas Rice
trice@pulmanlaw.com
Amber Fly
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

# EXHIBIT D

## SALE PROCEDURES

On September 27, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

These Sale Procedures have been approved and authorized pursuant to the Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts (the "**Sale Procedure Motion**") and the *Order Approving Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the "**Sale Procedures Order**"), entered by the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### A. <u>Assets to be Sold</u>

Debtors seek to consummate the Proposed Transactions with NH (as defined in the Sale Procedure Motion), including the sale of substantially all of their assets, as defined in the Sale Procedure Motion and draft Asset Purchase Agreement, which is attached to the Sale Procedure Motion. The Property shall be sold free and clear of all claims, encumbrances, liens, and interests. Debtors may consider bids from one or more Qualified Bidders for the Property; provided, however, that multiple bidders may not act together pursuant to a collusive agreement between or among them.

Generally, the Property includes all assets, rights, entitlements and privileges of the Debtors' assets and rights of the Debtors, including possibly (a) 32 locations and (b)(i) the assumption and assignment to NH of all leasehold rights in all locations or used in the Debtors' business operations; (ii) the assumption and assignment of all personal-property leases used in the Debtors' business operations and designated by NH in its sole and absolute discretion; (iii) the conveyance free and clear of all liens, claims, encumbrances, and interests of all inventory, furniture, fixture, equipment located at or used in the operation for each of the 32 locations, and (iv) conveyance of all intellectual property related to the operation of the Debtors' businesses, including, without limitation, all patents, permits, licenses, exemptions (including any pre-1949 or pre-1995 permits), trademarks, designs, social-media assets, e-commerce assets, URLs, customer lists, and data associated with the stores to NH free and clear of all liens, claims, encumbrances, and interests (collectively, items (i)-(iv) are the "**Property**") and (c) the acquisition of all stock in the Debtors. the Debtors propose to effectuate the Proposed Transactions, subject to higher and better offers.

The Property currently includes acquisition of the equity interests in Gabriel Investment Group, Inc., a publicly held corporation (the "**PubCo**") that is authorized to own liquor store permits under Section 22.16(f) of the Texas Alcoholic Beverage Code. Debtors will also consider offers seeking to purchase either the PubCo separately or purchase the Liquor Store assets without acquiring the equity interests in PubCo.

The Debtors have set up a data room, which can be accessed by contacting the Debtors' Investment Bankers at:

John J. O'Neill                     Brad Walker
NTA – A Riverbend Company           NTA – A Riverbend Company
(214) 870-5040                      (214) 616-6256
joneill@nta-riverbend.com           bwalker@riverbendssg.com

### B. <u>Submission of Initial Qualifying Bids by Potential Purchasers</u>

Any person desiring to submit a bid for the Property (a "**Bid**") and to participate in the auction of the Property (the "**Auction**") shall deliver their Bid and an executed copy of an Asset Purchase Agreement to Thomas Rice, Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213; Fax No. (210) 892-1610; email trice@pulmanlaw.com and deposit One Hundred Thousand and no/100 dollars ($100,000.00) (the "**Earnest Money Deposit**") with an escrow agent selected by the Debtors, such that the Bid is actually received **by close of business on April 15, 2020** (the "**Bid Deadline**").

Any such Bid submitted by the Bid Deadline shall be in the amount of at least $7,500,000 to be a Qualified Bid and to allow that Bidder to participate in the Auction of the Property.

### C. <u>Stalking Horse Bid</u>

The Court has approved the Stalking Horse Bidder, the Stalking horse Bid, and the bid protections. The Stalking Horse Bidder and PNC are Qualified Bidders. If no other Qualified Bids are received, the Stalking Horse Bidder shall be deemed the highest or best bid for the Property, and the Debtors shall seek approval of the Proposed Transactions with the Stalking Horse Bidder on the terms outlined in the Stalking Horse Bid.

### D. <u>The Auction and Selection of the Successful Bid</u>

If the Debtors receive one or more timely and conforming Qualified Bids by the Bid Deadline, Debtors shall conduct an Auction for the sale of the Property at the offices of Pulman, Cappuccio & Pullen, LLP, 2161 NW Military Highway, Suite 400, San Antonio, Texas 78213 on Monday April 20, 2020 at 1:30 p.m., prevailing Central Time and all Qualified Bidders may participate in such Auction.

If multiple Qualified Bids satisfying all requirements are received and Debtors determine to proceed with an Auction as set forth above, each Qualified Bidder (including PNC and the Stalking Horse Bidder) shall have the right to continue to improve its bid at the Auction.

At the Auction, Debtors shall announce the highest or best Qualified Bid received by the Bid Deadline, which Qualified Bid shall be the starting bid at the Auction. The Stalking Horse Bidder shall have the right to make the first overbid. All subsequent bids shall proceed in the order of receipt. Qualified Bidders may then improve their Qualified Bids, in increments of at least $100,000.00, overbidding the previous high bid at the Auction.

The Debtors, with the written consent of PNC, the Official Committee of Unsecured Creditors (the "**Committee**") and the Stalking Horse Bidder, retain the right to modify the Overbid Increment during the course of the Auction. By making a Qualified Bid, a Qualified Bidder shall be deemed to have agreed to keep its final Qualified Bid open until closing of the approved Sale.

At the conclusion of the Auction, Debtors shall request that the Court approve the highest or best Qualified Bid received at the Auction as the winning bid (the "**Successful Bid**") at a hearing to be held at Hipolito F. Garcia Federal Building and United State Courthouse, Courtroom No. 1, Third Floor, 615 E. Houston St., San Antonio, Texas 78205 on Thursday April 23, 2020 at 1:30 p.m., prevailing Central Time (the "**Sale Hearing**").

### E.  Objections to Sale

Any objection(s) filed to the sale of the Property, other than objections related to the assumption and assignment of executory contracts (which shall be submitted in accordance with the Sale Procedures Order) (i) shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position; (ii) shall be filed with the Court on or before April 17, 2020 (the "**Objection Deadline**"). Any person failing to timely file an objection to the Sale prior to the Objection Deadline shall be forever barred from objecting to the Sale, including the transferring of the Property free and clear of any and all liens, claims and other interests, and will be deemed to consent to the Sale.

Any objections to the assignment and/or assumption of any of the Debtors' executory contracts or agreements must be submitted in accordance with the timeline set forth in the Sale Procedure Order, which generally requires that any such objections be filed no later than twenty-one (21) days after service of the applicable assumption and assignment notice.

### F.  Court Approval

At the Sale Hearing, Debtors will seek entry of an order approving the sale of the Property to the Successful Bidder pursuant to 11 U.S.C. §363(f) and free and clear of all liens, claims, encumbrances, and interests. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court or by Debtors with the approval of PNC, the Committee and the Successful Bidder and without further notice to creditors and parties in interest other than by announcement by Debtors of the adjourned date at the Sale Hearing.

Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute Debtors' acceptance of the Bid. Debtors will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court.

### G.  Closing

The closing of the sale of the Property shall occur no later than April 30, 2020 (the "**Final Closing Deadline**"); provided, however, that this requirement may be waived upon an agreement between Debtors, PNC, the Committee and the Successful Bidder.

### H.  Failure to Consummate Purchase

If any Successful Bidder fails to consummate the purchase of the Property, and such failure to consummate the purchase is the result of a breach by such Successful Bidder, the Earnest Money Deposit of such Successful Bidder shall be forfeited to the Estates.

## I. **Back-Up Bidders**

If any Successful Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualified Bidder that had submitted the next highest or otherwise best Qualified Bid at the Auction (if any), as determined by the Debtors, PNC, and the Committee (the "**Back-Up Bidder(s)**") will be deemed to be the Successful Bidder for the Property and Debtors, with the consent of PNC and the Committee, will be authorized to consummate the Sale of the Property to such Back-Up Bidder without further order of the Bankruptcy Court and such Qualified Bid shall thereupon be deemed the Successful Bid. If any Qualified Bidder fails to consummate a Sale because of a breach or failure to perform on the part of such Qualified Bidder or for any reason within ten days after being deemed the Back-Up Bidder pursuant to this section of the Sale Procedures, the process described above may continue as determined by Debtors with the consent of PNC and the Committee, until a Qualified Bidder shall consummate the Sale.

## J. **Return of Earnest Money Deposit**

Unless otherwise outlined in the Asset Purchase agreement, the Earnest Money Deposit of all Qualified Bidders, who are not the Successful Bidder, will be returned, without interest, to each such Qualified Bidder as soon as reasonably practicable but in any event within seven (7) business days after the closing of the Sale.

## K. **Reservation of Rights**

1.    <u>Determination of Successful Bid</u>. Debtors, with the written consent of PNC and the Committee, retain the right to: (a) determine whether any Qualified Bid is a successful bid, (b) reject, at any time prior to the entry of the Sale Order, any Bid that the Debtors, with the written consent of PNC and the Committee, determine to be inadequate, insufficient, or not in conformity with the sale procedures.

2.    <u>Modification of Bidding Procedures</u>. Debtors, with the written consent of PNC and the Committee, may modify the Sale Procedures, without the need for any further order of the Bankruptcy Court, including, without limitation (a) extending the deadlines set forth in these Sale Procedures, and (b) adjourning the Sale Hearing.

## L. **As Is, Where As Sale**

The sale of the Property shall be on an "**as is, where as**" basis and without representations or warranties of any kind, nature, or description by the Debtors, their Estates, or their agents and representatives. Except as otherwise expressly provided in these Sale Procedures, by submitting a bid, each Potential Purchaser that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Property prior to makings its bid, (ii) has relied solely

upon its own independent review, investigation and/or inspection of any and all documents and/or the Property in making its bid, and (iii) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith.

**M. Debtor's Counsel**

Any questions regarding these Sales Procedures should be addressed to Debtors' Counsel whose contact information is:

Randall A. Pulman
rpulman@pulmanlaw.com
Thomas Rice
trice@pulmanlaw.com
Amber Fly
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., | § | BANKRUPTCY NO. 19-52298-RBK |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |

**NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WHICH MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO**

**You are receiving this *Notice of Executory Contracts and Unexpired Leases Which May Be Assumed and Assigned in Connection With the Sale of Substantially All of the Debtors' Assets and the Proposed Cure Amount With Respect Thereto* (the *"Notice of Assumption and Assignment"*) because you may be a counterparty to an executory contract or unexpired lease with Gabriel Investment Group Inc. et al. ("Debtors" or "Gabriel's"),[1] Debtors in the above captioned cases (the *"Cases"*). Please read this notice carefully as your rights may be affected by the transactions described herein.**

**PLEASE TAKE NOTICE** that on March [  ], 2020, the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the *"Bankruptcy Court"*) entered an order (the *"Sale Procedures Order"*) approving the *Debtors' Motion to Approve (A) Sale Procedures and Bid Protections in Connection with the Sale of the Debtors' Assets; (B) the Form of Notice for the Sale of the Debtors' Assets and (C) the Form of Notice Related to the Assumption and Assignment of Unexpired Leases and Executory Contracts* (the *"Sale Procedures Motion"*)*,* filed by the Debtors.[2] The Sale Procedures Order set forth certain procedures (the *"Sale Procedures"*) in connection with the sale of the Debtors' Assets (the *"Sale Transaction"*)*.*

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, the Debtors have established procedures for the assumption, assignment and sale of certain executory contracts and unexpired leases (collectively, the *"365 Contracts"*) to a potential purchaser and the determination of related Cure Costs (as defined herein). Debtors are a party to 365 Contracts and, in accordance with the Sale Procedures Order, hereby file this notice identifying (i) the 365 Contracts which may be assumed and assigned to a Successful Bidder in connection with the Sale Transaction and (ii) the proposed amounts, if any, the Successful Bidder believes are owed

---

[1] The terms "Debtors" and "Gabriel's" as used herein shall mean Gabriel Investment Group, Inc. ("GIG"), Gabriel GP, Inc. ("GP"), Gabriel Holdings, LLC ("Gabriel Holdings"), Don's & Ben's, Inc. ("D&B"), and S.A. Discount Liquor, Inc. ("Discount Liquor") collectively.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Procedures Motion.

to the counterparty to the 365 Contract to cure all defaults or arrears existing under the 365 Contract (the ***"Cure Costs"),*** both as set forth on **Exhibit 1** attached hereto.

**PLEASE TAKE FURTHER NOTICE** that the listing of a 365 Contract on **Exhibit 1** does not constitute an admission that the agreement is an executory contract or unexpired lease as contemplated by section 365(a) of the Bankruptcy Code or that the Debtors have any liability thereunder, and the Debtors expressly reserve all of their rights, claims, causes of action and defenses with respect to the 365 Contracts listed on **Exhibit 1.**

**PLEASE TAKE FURTHER NOTICE** that any objections to the assumption, assignment, and sale of any 365 Contract identified in this Notice (except with respect to the adequate assurance of future performance by any Successful Bidders), must be (i) in writing and (ii) filed with the Bankruptcy Court by no later than the earlier of (x) twenty-one (21) days from the date of this notice (the "***Assumption and Assignment Objection Deadline***") or (y) the date of the Assumption/Assignment Hearing. Any such objections must set forth any objection to the possible assumption, assignment, and sale of the 365 Contracts (and must state, with specificity, the legal and factual basis thereof) and, if applicable, the proposed Cure Costs (and must state, with specificity, what Cure Costs are required with appropriate documentation in support thereof).

**PLEASE TAKE FURTHER NOTICE** that if a counterparty to a 365 Contract files a timely objection asserting a higher cure amount than the maximum Cure Costs, and the parties are unable to consensually resolve the dispute prior to the hearing to resolve any such objection, which hearing will be held on April 23, 2020 (the ***"Assumption/Assignment Hearing"***), the amount to be paid or reserved with respect to such objection will be determined at the Assumption/Assignment Hearing. All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under the 365 Contracts, if it is ultimately designated a 365 Contract that the Successful Bidder proposes be assumed, assigned, and sold to it in connection with the transaction (a ***"Desired 365 Contract"***)**,** will also be heard at the Assumption/Assignment Hearing.

**PLEASE TAKE FURTHER NOTICE** that if no objection is timely filed and served, the counterparty to a 365 Contract shall be deemed to have consented to the assumption, assignment and sale of the 365 Contract to any Successful Bidder if such 365 Contract is designated by any Successful Bidder as a Desired 365 Contract and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by any Successful Bidder. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be filed with the Court by **April 22, 2020** and will be resolved at the Assumption/Assignment Hearing. The Cure Costs provided to the contract counterparty shall be controlling, notwithstanding anything to the contrary in any 365 Contract, or any other document, and the counterparty to the 365 Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors or the Successful Bidder, or the property of any of them.

**PLEASE TAKE FURTHER NOTICE** that within one (1) business day after the conclusion of the Auction, the Debtors will file the Successful Bidder's proposed form of adequate assurance of future performance with the Bankruptcy Court. Objections to the successful bidder's adequate assurance of future performance must be raised no later than April 22, 2020.

**PLEASE TAKE FURTHER NOTICE** that although the Debtors have made a good faith effort to identify all 365 Contracts that may be susceptible to being assumed and assigned in connection with the Sale Transaction, they may discover additional contracts that the Debtors and the Successful Bidder desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Sale Order, the Debtors identify additional prepetition executory contracts that may be subject to being assumed and assigned to the Successful Bidder(s), the Debtors shall serve a supplemental notice of assumption and assignment (the "*Supplemental Assumption and Assignment Notice*") by facsimile, electronic transmission, hand delivery or overnight mail on (i) the counterparty to each supplemental 365 Contract at the last known address available to the Debtors and ii) all parties who have requested notice in these Cases pursuant to Bankruptcy Rule 2002 by no later than ten (10) days before the proposed effective date of the assignment. Each such Supplemental Assumption and Assignment Notice shall set forth (i) the name and address of the contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of Successful Bidder to withdraw such request for assumption and assignment of the contract prior to the Closing), (iii) identification of the Contract, (iv) the Cure Costs, if any, to the extent such 365 Contract has been designated for assumption and assignment by a Successful Bidder, and (v) the proposed adequate assurance.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Assumption and Assignment is subject to the fuller terms and conditions of the Sale Procedures Order, with such Sale Procedures Order controlling in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties with questions regarding the proposed assumption, assignment, and sale procedures contained herein should contact the Debtors' counsel at the contact information provided below. The inclusion of a 365 Contract on **Exhibit 1** does not mean that such 365 Contract will be assumed or assigned in connection with the Sale Transaction or that the Debtors or any Successful Bidder will make any cure payment in connection with such 365 Contract.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Thomas Rice*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Thomas Rice
    Texas State Bar No. 24025613
    trice@pulmanlaw.com
    Amber F. Fly
    Texas State Bar No. 24101761
    afly@pulmanlaw.com

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

# Exhibit 1

List to be Provided